# RECORD IMPOUNDED

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4041-11T4

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

J.T.,[1]

    Defendant-Appellant.

_____

**APPROVED FOR PUBLICATION**

**June 13, 2018**

**APPELLATE DIVISION**

Argued January 19, 2017 — Decided June 13, 2018

Before Judges Fuentes, Simonelli and Gooden Brown.

On appeal from Superior Court of New Jersey, Law Division, Bergen County, Indictment No. 09-06-1113.

Brian J. Neary argued the cause for appellant (Law Offices of Brian J. Neary, attorneys; Brian J. Neary, of counsel and on the briefs; Jane M. Personette, on the briefs).

Ian C. Kennedy, Assistant Prosecutor, argued the cause for respondent (Gurbir S. Grewal, Bergen County Prosecutor, attorney; Deepa S.Y. Jacobs, Assistant Prosecutor, of counsel and on the brief).

The opinion of the court was delivered by

FUENTES, P.J.A.D.

_____

[1] We use initials or pseudonyms to refer to defendant and the victims of these crimes pursuant to Rule 1:38-3(c)(9) and N.J.S.A. 2A:82-46(b).

Defendant J.T. was indicted by a Bergen County Grand Jury and charged with the murder of her husband, M.T., N.J.S.A. 2C:11-3(a)(1)-(2) (count one); first degree attempted murder of her minor daughter, K.T. (Karen), N.J.S.A. 2C:5-1 and N.J.S.A. 2C:11-3(a)(1)-(2) (count two); second degree endangering the welfare of Karen, N.J.S.A. 2C:24-4 (count three); second degree endangering the welfare of her minor son, A.T. (Angel), N.J.S.A. 2C:24-4 (count four); and third degree terroristic threats against Karen and Angel, N.J.S.A. 2C:12-3(b) (count five). These charges arise from events that occurred on March 29, 2009. The indictment also charged defendant with two crimes that allegedly occurred on an unspecified date between November 12, 2008 and March 1, 2009: first degree attempted murder of Karen, N.J.S.A. 2C:5-1 and N.J.S.A. 2C:11-3 (count six); and second degree endangering the welfare of Karen, N.J.S.A. 2C:24-4 (count seven).

On December 28, 2011, the jury acquitted defendant of murder, but found her guilty of the lesser included offense of aggravated manslaughter, N.J.S.A. 2C:11-4(a). The jury also found defendant guilty of all of the remaining counts in the indictment. On February 29, 2012, the trial judge sentenced defendant to a term of thirty years, with an eighty-five percent period of parole ineligibility and five years of parole supervision, as mandated by the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2; a term of

2

ten years on count two, attempted murder of Karen, subject to NERA; and five-year terms on counts three and four, endangering the welfare of Karen and Angel. The judge ordered all of the sentences imposed on these offenses to run consecutive, resulting in an aggregate term of fifty years, subject to the parole restrictions of NERA.

On the remaining counts, the judge imposed concurrent terms of imprisonment as follows: a five-year term on the conviction of third degree terroristic threats; a ten-year term on the conviction of first degree attempted murder of Karen prior to March 29, 2009; and a five-year term on the conviction for second degree endangering the welfare of Karen prior to March 29, 2009.

The central issue in this appeal does not concern whether defendant actually engaged in the conduct that led to this criminal prosecution. Defendant admitted she suffocated her husband and then attempted to suffocate her children. The question before the jury was whether defendant was legally insane at the time she engaged in this conduct. The jury found defendant was legally sane and therefore criminally culpable.

In this appeal, defendant raises the following arguments:

Point I

MULTIPLE IRREGULARITIES INVOLVING THE JURY REQUIRE THAT DEFENDANT'S CONVICTION BE REVERSED AND THE MATTER REMANDED FOR A NEW TRIAL.

a. The method of jury selection was neither random nor conducted in a manner consistent with [N.J.S.A.] 2B:23-2.

b. [Defendant's] due process rights were violated when the [c]ourt addressed the jury pool in her absence.

c. The misconduct of two jurors, and the [c]ourt's thoroughly inadequate ex parte voir dire of them, prejudiced [d]efendant, resulting in a denial of due process and require reversal.

d. The [c]ourt below erred in failing to declare a [m]istrial.

Point II

VARIOUS ERRORS REGARDING THE TESTIMONY OF DR. STEVEN SIMRING REQUIRE REVERSAL.

a. Dr. Simring impermissibly opined on the ultimate issue of guilt, thus requiring that [d]efendant's conviction be reversed. ([N]ot raised below).

b. The violation of the sequestration order by the State's expert requires reversal of [d]efendant's conviction.

Point III

VARIOUS ERRORS REGARDING THE TESTIMONY OF STATE WITNESS, [DEFENDANT], PREJUDICED DEFENDANT, THUS REQUIRING HER CONVICTION TO BE VACATED AND THE MATTER REMANDED FOR A NEW TRIAL.

a. Summary of [defendant's] trial testimony.

b. Multiple errors regarding the video and transcript of [defendant's] statement of March 29, 2009 require [d]efendant's conviction to

4

be vacated and the matter remanded for a new trial.

c. The procedure employed by the [c]ourt below violated [defendant's] Sixth Amendment right to confrontation.

d. Prosecutorial misconduct requires that [defendant's] conviction be vacated and a new trial [o]rdered.

Point IV

CUMULATIVE TRIAL ERRORS IN THE CONTEXT OF THE PROCEEDINGS BELOW DEPRIVED DEFENDANT OF A FAIR TRIAL AND WARRANT REVERSAL.

Point V

THE SENTENCE IMPOSED BY THE COURT BELOW IS EXCESSIVE.

a. The [c]ourt below failed to credit [defendant] with all applicable mitigating factors.

b. Concurrent sentences should have been imposed.

c. The [c]ourt below erred in failing to sentence [d]efendant as if convicted of offenses one degree lower.

In light of the record developed at trial, we reverse defendant's conviction and remand this matter for a new trial. The record shows the prosecutor asked the expert witness to define "legal insanity." This question required the State's expert to improperly opine on defendant's state of mind, stating that defendant had "the specific intent" to kill her husband. This opinion testimony usurped the jury's exclusive role to decide this

critical factual issue, rendering any verdict tainted by it unsustainable. State v. Cain, 224 N.J. 410, 424 (2016). Although this issue is before us as a matter of plain error under Rule 2:10-2, we are satisfied that this testimonial evidence is "of such a nature as to have been clearly capable of producing an unjust result." R. 2:10-2.

Although not outcome determinative, this opinion also includes a detailed description and analysis of the trial judge's ex parte interactions with a pool of prospective jurors. We have taken the time to do this because there are no reported decisions by any court in this State addressing this particular issue.

I

## The Incident

Defendant worked as a computer programmer at the New Jersey Institute of Technology (NJIT); her husband M.T. was primarily responsible for the rearing of their children as a stay-at-home father. The couple's two children, Karen and Angel, were fifteen and ten years old respectively at the time of their father's death.

In early November 2008, M.T. suffered a stroke that caused severe physical and cognitive impairments and left him unable to care for himself. Witnesses familiar with the family uniformly testified that before M.T.'s stroke, the couple appeared to have a good relationship, and the family was close and enjoyed spending

time together. The children's testimony corroborated these impressions of familial harmony. Karen described her father as humble, "very kind and modest," and defendant as caring, strong and "very hardworking." Both children described defendant as a "good mom" who rarely yelled and never resorted to corporal punishment.

On November 21, 2008, M.T. was discharged from the hospital and transferred to the Kessler Rehabilitation Center (Kessler), where he remained until January 6, 2009, when he was thereafter transferred to Maple Glen Care Center (Maple Glen). Soon after, defendant's insurance company issued a "cut letter," advising that it would not cover M.T.'s stay at Maple Glen beyond February 11, 2009.[2]

By all accounts, defendant soon became overwhelmed by the responsibilities of being her husband's sole caretaker, the family's sole wage earner, and the de facto single-parent of two children. She was especially distressed after she learned that M.T. was not eligible to receive social security benefits. This required her to "spend down" the family's assets by $81,000 before

---

[2] At trial, the admissions director at Maple Glen explained that an insurance company issues a "cut letter" when it determines that a patient has maximized the benefits of his or her stay at a rehabilitation center and is unlikely to progress any further.

A-4041-11T4

M.T. could receive Medicaid.[3]   Witnesses who knew defendant testified that she worried incessantly about her husband's medical expenses and feared that they would consume all of the family's resources, leaving nothing left to cover the cost of the children's college education.

Defendant's work supervisor, David Ullman, referred her to the Employee Assistance Program (EAP) for counseling because he believed she was "at the end of [her] rope."  Ullman testified that defendant would talk to him about dying and seemed like she was "giving up."  Karen and Angel testified that their mother changed from being a "very strong" person to being "really depressed, and not really herself."  Karen testified that she saw her mother's mental state deteriorate over time; she acted "mad" and "crazy."

Karen provided the following description of her observations of her mother's melancholic disconnection:

> There was a time when -- it's like later in the time period before the incident, she -- she was talking -- not saying the word, but she was talking about being suicidal.  There was a time when she just . . . wanted to die. She wished that she was dead.  She wished -- she just wished that everything would be over, because this felt like such a huge boulder on her shoulders.  It was a huge burden.

---

[3] This "spend down" or partial depletion of the family's assets in order to qualify for Medicaid assistance was based on a valuation of the family's assets as being approximately $190,000.

A-4041-11T4

. . . .

Q. [D]o you remember exactly what she said?

A. There was one [time] when she said that she had threatened - - she almost was in the parking lot, and she wanted to jump off, because it was like a certain floor, and it was high up from the ground.

Q. And she told [you] that?

A. Yes.

Angel corroborated his older sister's description of defendant's lugubrious mood and frustration over his father's condition, and how her emotional state deteriorated over time. However, in response to defense counsel's questions on cross-examination, Angel made clear defendant never engaged in physical violence:

Q. [W]ould you say that your mom was getting more and more stressed?

A. Yes.

. . . .

Q. Now, you said to the Prosecutor that she talked about that she was mad. She . . . never hit you; is that right?

A. No.

Q. Okay. Never hit [Karen]; right?
A. Never.

Q. Never hit your dad either; right?

A. No.

9

Angel also testified that he and his sister's mutual concerns over the situation prompted Karen to write a letter to defendant on February 21, 2009, approximately one month before her father's death.[4]  The letter provides, in relevant part, as follows:

> I know [these] past couple of months have been tough on us . . . . BUT, PLEASE! LISTEN TO ME! You seriously have gone insane! Your emotions are slowly destroying your decision-making skills! All I see from you every single miserable day [is] despair, depression, insanity [and] psychotic craziness . . . .
>
> [Angel] and I try to make you smile a little [but] you just fall into a deeper depression[.]
>
>     . . . .
>
> We need you back! We think you are beautiful [and] loving deep down inside hiding from [the] madness you show now.

Defendant's behavior also alarmed employees at Maple Glen, the rehabilitation center that treated M.T. after he was transferred from Kessler.  They testified that defendant obsessed about M.T.'s care and the cost of his treatment.  Kay Giacelone, an admissions director at Maple Glen whose responsibilities included patient intake and working with Medicaid, testified that defendant repeatedly asked variations of the same two questions on a near-daily basis, namely: (1) whether M.T. could qualify for

---

[4] Although Karen confirmed the letter was in her handwriting, she testified that she did not recall actually writing it.

Medicaid; and (2) whether he would ever regain the ability to walk independently.

Sheila Hudley, an assistant director at Maple Glen, testified about a conversation she had with defendant on February 26, 2009:

> She had come in to see . . . how he was doing, have I heard anything . . . . I guess she wanted to know how his rehab was doing. And I basically tried to let her know she had to talk to [the treatment staff]. But, when I saw him, he was walking with Jackie [(the Occupational Therapist)]; he was okay . . . [Defendant asked if] I had seen him that day, and I said, "Yeah, I'd seen him," . . . probably earlier that day . . . in the dining[-]room area . . . with other patients . . . .
>
> . . . .
>
> [S]he asked me if he cannot, . . . she stated he couldn't live like . . . that. And I said, "What are you talking about?" As best as I remember, she said, "He cannot live like that. Do we do an injection?" So I asked her, "What are you talking about?" She asked me, "Do we let people die . . . "

[(Emphasis added).]

When the witness paused, the trial judge decided to call a recess of the morning session. When the trial resumed in the afternoon, Hudley testified that immediately after this encounter with defendant, she sent an email to her Supervisor, to the center's Administrator, and to the Director of Nursing, documenting what defendant had told her concerning her husband's

11

wishes to end his life if there was no realistic prospect of improvement of his physical condition.

Hudley also mentioned in her email that defendant was "worr[ied] about money for her kids' education and can't keep spending down . . . ." Although defendant had signed a "DNR" (Do Not Resuscitate) directive for her husband, she insisted "this was not good enough and she wanted to get the doctor . . . to give him an injection so he can die in peace." Hudley characterized defendant's state of mind as "off her rocker" and "nuts." In the email, she cautioned her colleagues: "we better all watch this lady . . . ." In her response to Hudley's email, Giacelone stated that she would ask the "psych doctor to see and evaluate [defendant stat.]" The staff at Maple Glen concluded that defendant did not seem to understand or accept the nature of her husband's brain injury.

A few weeks after Hudley's encounter with defendant, M.T. had a home visit to determine if he could return home permanently. The visit was brief and "stressful" for the entire family. The level of intensive care M.T. required, particularly around mealtimes, revealed the futility of any attempt to have him home without a permanent healthcare aide. On March 28, 2009, M.T. was sent home a second time; he died the next morning.

12

In addition to M.T.'s difficulties at mealtimes, Angel and Karen highlighted two incidents that occurred before M.T.'s death. Early in the evening, M.T. accidentally ripped the bathroom sink off the wall when he leaned on it for support. According to Angel, defendant became "really, really mad." At some point after ten o'clock that evening, Angel heard defendant yelling at M.T. for urinating on the bed. Angel testified that he fell asleep sometime thereafter. He was later awakened by the loud sound of his father "gasping for air." When asked to describe the volume of the sound, Angel responded: "Pretty loud." The child testified that the sound lasted for approximately "five seconds." Although he shared a bedroom with his sister, Angel stated Karen remained asleep at this time. The following exchange captured what occurred next from Angel's perspective:

> Q. And was [Karen] in the bed at this point?
>
> A. Yes.
>
> Q. And did you try to wake [Karen] up at all?
>
> A. No.
>
> Q. Did you say anything?
>
> A. No.
>
> Q. But you were scared?
>
> A. Yes.

A-4041-11T4

Q. Okay.  What's the next thing you remember after that?

A. I saw my mom come into the room, maybe like a minute after this, after the gasping, and she came in with a plastic bag.  And then, she was about to put the bag on [Karen's] head, and [Karen] knocked it out of the way.

Q. Okay.

A. And that's when they started arguing.

. . . .

Q. Did [defendant] say anything when she came into the room?[5]

A. No.

Q. How did that make you feel?

A. More scared.

Q. What did you think was going to happen?

A. That she was going to suffocate me and [Karen].

. . . .

Q. And if you could, show us how close you saw that bag come to your sister's head?

A. Maybe a foot.

. . . .

Q. And what did [Karen] do?

---

[5] Although the bedroom light was off, Angel testified he could see what was taking place because the room's window-blinds were not "completely closed," and there was light that came from the bathroom's window.

A-4041-11T4

A. She like grabbed the bag and pushed it away.

Q. And what happened after that?

A. Then my sister and mom got into an argument.

Q. What did you hear them saying?

A. My sister was yelling, oh, why are you doing this, mom?  Why did you do this?  What just happened?  And then my mom was like yelling back, oh, we can't do anything else, like I killed dad, and stuff like that.

Karen's testimony corroborated her brother's account of defendant's conduct.  Karen testified that she fell asleep after her father accidently ripped the bathroom sink off the wall, "then the water started squirting everywhere."  She testified:

> A.  I had a nightmare . . . about my dad screaming for help.  My mom had a knife in her hand.  And I didn't see like a stab, but I see a knife going down, and I see blood squirting.
>
> And I woke up without opening my eyes assuming that it was just a nightmare.  And I opened my eyes and I see the bag over -- almost over me.
>
> Q. What type of bag?
>
> A. A plastic bag.
>
> [At the prosecutor's request, Karen demonstrated for the jury how close the bag was from her head at the time she woke up.]
>
> . . . .
>
> Q. Who had the plastic bag by your head like this?

A. My mom.

At this point, Karen testified she did not remember what her mother did next. In the presence of the jury, the prosecutor asked Karen if she recalled viewing a video recording of a statement she gave to a law enforcement investigator on March 29, 2009, more than two years before the start of the trial. When Karen responded "yes," the prosecutor asked her if viewing the video statement refreshed her memory "as to what [she] said about what happened after [her] mom had the plastic bag by [her] head?" Karen answered:

> A. I don't remember what happened from bedroom to kitchen. But I'm in the kitchen and I'm struggling with my mother. And I don't know where my brother is. He--he just ran outside. But at that time I didn't know what to do, because I really couldn't think.
>
> Q. What was your mom--what do you remember you and your mom doing in the kitchen?
>
> A. We were struggling, and I kept telling her, mom, mom, we can still live. You shouldn't do this to us.
>
> Q. Why did you say that?
>
> A. I said it because I thought she was going to kill us.
>
> Q. Why did you think she was going to kill you?
>
> A. I felt like I didn't see a mother anymore. I saw a monster through her eyes. And I was just trying to talk her out of it.

16

Q. Talk her out of what?

A. Talk her out of this depression and [her] suicidal thoughts . . . .

Q. And were you also afraid for yourself at that point?

A. Yes.

Karen testified that when she next saw her father that night, "he was white." She immediately thought that her mother had killed her father.

While this horrific scene between defendant and her daughter unfolded, Angel fled the home and attempted to get help from his maternal uncle and grandparents. After several phone calls, Angel finally reached defendant's younger brother, W.C. (Wayne). Wayne testified that when he checked his voice mail at approximately 8:30 a.m., he noticed he had several messages from Angel. The first message was left at around 8:08 a.m., and stated: "Uncle [Wayne] . . . this is an emergency; I need you to come over right away." In the second voice message Angel "sounded more urgent;" the child stated: "I need you; I really need you to come over right away."

When Wayne called back, Angel told his maternal uncle that defendant was trying to kill him, herself, and Karen. Wayne testified that he told Angel to give the phone to defendant. Wayne

17

said his sister's voice sounded "frantic." She told him that she had killed M.T., that "she want[ed] everything to end" and take the children with her. He told her not to do "anything . . . stupid, anything rash . . . [b]ecause at that time, I thought . . . she was thinking irrational[ly] . . . ." Although Wayne thought defendant was acting hysterically, he did not believe that she had actually killed her husband.

At approximately 8:50 a.m., Angel called 911 and told the dispatcher that his mother was trying to kill him. Elmwood Park Police Officers Marc D'Amore and Nicholas Petronzi responded to the call and arrived at the residence at approximately 9:00 a.m. D'Amore testified that when they arrived, the front door to the home was open. When he stepped into the residence, he saw defendant "sobbing quietly with her head in her hands." D'Amore found M.T. on the bed; the deceased was already showing signs of rigor mortis. Both D'Amore and Petronzi testified that defendant was visibly upset and spoke rapidly in a rambling manner, interjecting statements about having "too many hospital bills and had no money." D'Amore testified that defendant told him: "[M.T.] urinates and I have to clean it up. He broke everything in the house last night and Kessler kicked him out because we have no money." She also stated that she killed M.T.

The officers arrested defendant in her residence. Petronzi testified he escorted defendant handcuffed to his patrol car, where he read to her the standard Miranda[6] rights from a card he carried in his pocket. However, when he asked her if she understood those rights, defendant was unresponsive and merely stared straight ahead. The drive to the police station took approximately six to eight minutes. During this time, defendant continued "rambling" to the officers "that she had too many bills, too many hospital bills, that she [had] no money, and that she had no money for her kids['] college." She also told the officers: "Put a bullet in my head. I want to die."

Defendant continued to behave in this manner after she arrived at the police station. Elmwood Park Detective Robert Centowski testified that when he approached defendant to gather background information, she was rocking back and forth on the metal bench to which she was handcuffed. Although she was not crying, he described her demeanor as "visibly upset." Centowski was unable to complete the standard background interview because defendant repeatedly answered his questions with nonresponsive statements of an incriminating nature. For example, when Centowski asked defendant for her name, she "smirked" and said, "[w]ell, not

---

[6] Miranda v. Arizona, 384 U.S. 436 (1966).

really--not [T] anymore. That was my husband's last name." When he asked her for her date of birth, she responded: "What do you want me to do? He can't even go to the bathroom. He makes a mess. He ruined our lives. All of our savings go to bills. My children have nothing now."

Bergen County Prosecutor's Office (BCPO) Detective Gregory Kohles was assigned to question defendant about what had occurred at her home. He conducted the interrogation at the Elmwood Park Police Station. When asked by the prosecutor to describe defendant's demeanor when he first saw her, Kohles responded: "Obviously, a . . . terrible thing had taken place. She was -- I would say distraught is the best way to describe her. She was distraught and obviously very upset over everything that was going on." From 11:37 a.m. to 1:03 p.m., Kohles asked defendant whether she understood her Miranda rights five to six times. During this approximately ninety-minute time period, Kohles said defendant was unfocused and preoccupied with explaining what happened.

According to Kohles, defendant repeatedly told him that she wanted to die. As a result, Kohles determined that "no matter what," once the interrogation was concluded, defendant should be referred to Bergen Regional Medical Center (Bergen Regional) for a psychiatric evaluation. In fact, defendant never signed the standard Miranda waiver form. Kohles testified that "due to her

emotional state . . . it took until 1:03 [p.m.] when she finally verbally understood and said that okay, I'm willing to answer <u>some of your questions and explain what's going on</u>."[7] (Emphasis added).

Defendant told Kohles that she became frustrated with M.T. when he urinated on the bed and laid back down on the soiled sheets after she had just changed his clothes. When she asked him to get up, he purportedly refused to move because he was tired and wanted to sleep. In the course of the interrogation, defendant revealed the thoughts that ran through her mind as she contemplated the prospect of spending an indeterminate amount of time caring for M.T.'s every need. She found particularly distressing envisioning the details of having to perform the tasks related to M.T.'s personal grooming needs. She derived no solace from knowing that a home-health aide would likely be available to assist M.T. with performing many, if not all, of these aspects of his personal care. Her non sequitur replies to her interrogators' questions revealed defendant saw herself trapped in a loop of despair caused by two seemingly unsolvable problems: (1) the drain on the family's financial resources caused by M.T.'s never ending personal needs;

---

[7] The trial court found defendant's statements were admissible because she voluntarily, knowingly, and intelligently waived her rights under <u>Miranda</u>. This ruling is not challenged on appeal.

and (2) the disgust she felt cleaning up after M.T.'s uncontrollable biological functions.

As this psychological/emotional cyclone ravaged the stability of this family, defendant responded by telling M.T. to "go ahead, you can sleep forever." She then "let [M.T.] go" to a "better place." She told the detectives that she had to "release him" and that her actions had nothing to do with the kids. At one point, the interrogating officers asked defendant how she suffocated her husband, asking her if she "choke[d] him?" She responded:

> A. I actually tr[ied] to put the plastic on him too.
>
> Q. Plastic?
>
> A. I put the plastic on my hand . . . .
>
> Q. Plastic? What? Like saran wrap or like a plastic wrap?
>
> A. The shopping, the shopping bag.
>
>      . . . .
>
> Q. [S]o that's over his face and then your hand over it?
>
> A. Only his nose.
>
> Q. His nose and mouth? Okay. Okay. Does he realize what's going on or anything like that or no?
>
> A. In a way he, he was, he probably wondering what, what happened.
>
> Q. Okay.

22

A. And I'm telling him, you won't remember.

Q. Right.

A. Ten years from now you won't remember anything.

Q. Okay.

A. He lives in a better place.

Defendant also told the interrogating officers: "After 7:00 [a.m.] I was trying to kill myself . . . I had the plastic ready." After she allegedly placed the bag over her, defendant said she "started feeling something" and decided to see her children one last time. She explained:

> [Karen] asked me what I'm doing. I said, oh, I want to, I want to bring you with me. She saw the plastic [bag], she immediately grab[bed] it . . . .
>
> . . . .
>
> I told her . . . I want to bring you with . . . me and your brother. She immediately grabbed the thing off my hand and she started screaming, mom, you cannot do that, we need you and I say, I'm really sorry, but I already let your father die. I let your father go. I don't [want to] leave you and your brother on earth alone. I want to bring you with me.

Shortly after this exchange, defendant's answers became a series of nonresponsive statements that wandered into unrelated topics, including: (a) problems she was having with the house's heating system; (b) her father's disapproval of M.T.; and (c) her

23

children and her general frustration with medical industry practices. She also mentioned a conversation she allegedly had with M.T. before his stroke concerning a news story about a comatose woman. Defendant claimed that she and her husband agreed then that each would let the other spouse die under those circumstances.

At the conclusion of the interrogation, the police officers transported defendant to Bergen Regional for a suicide assessment. Dr. Steven Simring, the State's expert witness in the field of forensic psychiatry, testified that the attending doctor at Bergen Regional gave defendant a global assessment of functioning score (GAF)[8] of ten and made "an admitting [tentative] diagnosis" of defendant of "Axis I . . . major depressive disorder single episode severe with psychotic features." Dr. Simring explained that after a week of observations, defendant's diagnosis was revised to "major depressive disorder occurrence severe without psychotic features." Defendant was discharged from Bergen Regional and considered "safe to return to jail."

---

[8] The GAF score is on an objective scale of zero to one hundred, with ten representing a homicidal or suicidal individual and one hundred representing someone who is functioning normally.

II

The Trial

A

On Monday morning, November 28, 2011, the vicinage's Jury Manager's Office sent a venire of prospective jurors to the judge assigned to try this case.  For reasons not disclosed in this record, the judge allowed the jurors to enter the courtroom <u>and</u> <u>addressed them concerning the nature of the case, without the</u> <u>attorneys or defendant present</u>. (Emphasis added).

> THE COURT: All right.  Everybody has a seat now.  Good morning, everyone.  [Y]ou've been assigned to me in order to select a jury for the case [of] [<u>State v. J.T.</u>] on Indictment No. 1113-09.
>
> We'll be starting this trial tomorrow and we're going to work every day except for Mondays and Fridays.  Monday is a calendar call day here at the Courthouse for the criminal cases.   This is a criminal case. And on Fridays we do sentences.  So, that's why the trials are reserved for Tuesday, Wednesday and Thursday.
>
> So, with regards to the duration of the trial, it would be, obviously, this week Monday -- I'm sorry -- Tuesday, all day tomorrow, then Wednesday it would be half-day, and Thursday it would be half-day.  So, at 12:30 you would be dismissed, and then you can go back to work, or do whatever you'd like to do.

At this point, we pause to emphasize that the record does not reflect that the judge discussed any trial scheduling details with the attorneys. In fact, the judge conducted a lengthy explanation with this group of prospective jurors that covered not only that current week, but what the judge anticipated would occur the following week. The judge continued:

> [W]e don't think that the case is going to go that long, but just in case, we always have a reserve of additional days, but the case is a rather short case. <u>It's a criminal case that should only take three to four days</u>[9] . . . .
>
> Now, I know that they're selecting jurors in the Civil Division. They're working on a medical malpractice case, and there's another Judge who is also working in the Civil Division who is selecting [jurors] today . . . .
>
> Those cases are all scheduled to last anywhere between three to four to five weeks. <u>So as you [can] tell, this is a very short case</u>. So, it's better that you stay here . . . [because] you could satisfy your jury duty [with] a short case . . . .
>
> [(Emphasis added).]

The judge also acknowledged the upcoming holiday season, but assured the jury pool:

---

[9] Including the jury selection process, the trial actually lasted thirty calendar days.

> [I]'m sure to get you out of here before the
> Christmas holidays. I'm telling you, it will
> not go that far.
>
> So, if you have a holiday, if you have a
> vacation plan for Christmas, that's fine.
> It's not going to interfere in any way with
> your vacation schedule. This is just a short
> trial and . . . we will surely be done before
> the 19th of December.

The record does not contain any information that explains how the judge arrived at the estimates of the expected length of the trial that she provided to the prospective jurors. The only basis we have in this record from which to infer how this ex parte exchange occurred comes from the judge's following comments:

> [The Jury Manager's Office] had originally
> scheduled you to come here at 1:30 [p.m.], but
> I didn't want to have . . . your whole day --
> wasted, you know? I said if I could get this
> done in the morning, it's better. This way
> they have the rest of the day to do whatever
> they like.

Finally, we are compelled to note that the judge concluded her address to the jurors without including cautionary instructions: (1) not to discuss the case among themselves or with anyone else; and (2) not to conduct any kind of research on the case, especially on the internet. Because the judge identified defendant by name and stated the case's indictment number, the failure to provide this admonition to the jurors proved to be particularly problematic. Trial judges must be mindful that in

this Internet age, the availability of pertinent information about any criminal case, especially one involving these tragic details, is but a click away.

The State does not address this issue in its eighty-four-page appellate brief. Defendant's appellate counsel, who was the attorney who represented her at trial, asserts that the judge did not consult with him before she addressed the jury pool on November 28, 2011. Defense counsel also points out that "the trial continued well past the time incorrectly estimated by the [c]ourt . . . ."

Defendant, her counsel, and the prosecutor were present when the court reconvened on Tuesday morning, November 29, 2011. The transcript of these proceedings does not indicate the time the court session began. Based on the nature of the issues discussed in open court, we infer the prospective jurors were not in the courtroom at the time the trial judge and counsel discussed a plethora of issues, some involving mundane matters, and others concerning significant legal questions, including the admissibility of defendant's inculpatory statement made during her custodial interrogation. As to the duration of the trial, the judge asked the prosecutor: "How long do you anticipate the entire trial to be . . . including the defense case[?]" The prosecutor

responded: "I believe testimony would conclude . . . some day [in] the week of December 19th, [2011]."

The attorneys also spent a significant amount of time discussing the substance and phraseology of the voir dire questions and the methods the judge would use to present these questions to the prospective jurors.  In the course of these discussions, defense counsel confirmed that the court clerk planned on "prequalifying" the jurors by "individually voir diring them here, as opposed to sitting fourteen in [the jury box]."  This prompted the following exchange:

> DEFENSE COUNSEL: [H]ave these jurors been spoken to about this case before? About this particular case?
>
> THE COURT: No.  They know nothing about the case other than they came here yesterday, and they were told to return today.  And they're here today, right?
>
> COURT CLERK: Yes.
>
> THE COURT: You took attendance?
>
> COURT CLERK: Uh-huh.
>
> THE COURT: So, they know nothing about the facts of the case.  They don't know anything other than you're here.  You've been assigned to the Criminal Division for selection of a jury.  Jury selection starts tomorrow, November 29th, [2011].  Be here at 8:30 [a.m.].
>
> DEFENSE COUNSEL: Okay.

THE COURT: So, they're going to learn about this case for the first time today.

DEFENSE COUNSEL: So, the [c]ourt is aware. Actually, there . . . had been some publicity concerning this case at the time of . . . its event. It showed up as front page news . . . on The Bergen Record . . . a number of times.

Thus, despite the length and breadth of these discussions and the specificity of defense counsel's questions, the judge failed to disclose to the attorneys that in the course of the previous day's ex parte interactions, the judge told the prospective jurors defendant's name and the case's indictment number.

The first indication of the prospective jurors' presence in the courtroom on Tuesday, November 29, 2011, is found on page fifty of the 138-page transcript. After reading the charges against defendant contained in the indictment, the judge addressed the anticipated length of the trial: "Now, this case is a short case compared to other cases that are being heard and jurors are being selected for those trials right now. We have civil cases and we have criminal cases right now where other judges are selecting." With respect to scheduling, the judge stated:

You, obviously, have to be here today. You would also have to be here tomorrow and Thursday.

. . . .

Now, with regards to the following week, it's December 13th, 14th and 15th . . . [a]nd

30

then the following week would be December 20, 21st, 22nd, and if need be, the 23rd, but I really do not believe that the case will go further than that.

With regards to jury deliberations, if you choose, you can come back the week after Christmas to continue . . . but I do not believe that this case will go past the 22nd.

During the jury selection process on November 29, 2011, a prospective juror disclosed that he had researched the case on the internet the previous evening (November 28, 2011) and had discussed the case with his wife. The trial judge, having apparently forgotten that she had disclosed the case name and indictment number to the jurors the day before, insisted she did not know how this particular juror had obtained the information:

THE COURT: I told [the jurors] to come the next day.

DEFENSE COUNSEL: [Y]ou brought them in the room. You told them the name of the case.

THE COURT: No. I don't agree with that. Your objection is noted for the record [but] I really doubt [it].

The record shows defense counsel made numerous attempts to articulate his objections and preserve his argument on the record. The judge continuously interrupted counsel, ultimately stating: "Everything doesn't have to be done right now." Counsel asked the judge to "consider taking a short break so I can articulate the argument and I think, very honestly, that we may have to go to the

31

tape from yesterday to find out what, in fact, was said." The judge remained inflexible on the subject:

> THE COURT: I'm not doing it now.
>
> DEFENSE COUNSEL: -- but, Judge, we [are] going to spend all our --
>
> THE COURT: [Counsel], we're not doing it now.
>
> DEFENSE COUNSEL: Judge, you have these --
>
> THE COURT: Take a deep breath. We're not doing it now, okay?
>
> DEFENSE COUNSEL: -- I — oh, Judge, I take a lot of deep breaths, but it may make it germane because, you know, we may . . . spend the whole afternoon picking people that we may have to declare a mistrial.
>
> THE COURT: Well, I don't agree with your -- I don't agree with a mistrial.
>
> DEFENSE COUNSEL: But, mistrial -- you haven't -- but you didn't remember that you had said something about it yesterday because . . . obviously this [juror] said there's --
>
> THE COURT: - - <u>I had absolutely no interaction with them other than to tell them to come back the next day</u> . . . <u>I did tell them it was a criminal case</u>.
>
> DEFENSE COUNSEL: -- [B]ut you must have said the name of the [defendant] because how else would he know?
>
> THE COURT: All right. I'll . . . do it this way. Even if I said the name, I still do not find that it's a mistrial because there was no selection . . . of any kind.
>
> . . . .

> DEFENSE COUNSEL: [B]ut the problem was that the defendant wasn't present at the beginning.

[(Emphasis added).]

When the prospective jurors returned to the courtroom, the judge gave the following instructions with respect to conducting independent research concerning the case:

> And I know a lot of you have, you know, strawberries, raspberries, and Blackberrys, and you know, they're almost like a mini-computer that you carry around with you, but it is absolutely imperative that you do absolutely no research about this particular case with regards to your jury service, and that's before, during and after the case. And that's, obviously, to protect the integrity of the case with regards to the evidence.

On December 1, 2011, defense counsel obtained an audio-video recording of the November 28, 2011 proceedings and renewed his objections to the judge's ex parte remarks to the jury. Counsel began his address to the judge by quoting Rule 3:16(b), which provides, in relevant part: "The defendant shall be present at every stage of the trial, including the impaneling of the jury . . . ." He then placed on the record how the jury selection process had proceeded up to that point. Counsel then addressed the trial judge directly as follows:

> [W]hen the [c]ourt represented on the tape that the case would be over by December 15th, you never asked me that question -- and I won't put [the prosecutor] in this spot, but I doubt

you asked her that question either. [It was] not only unrealistic, [it was] wrong. It's wrong. And a whole discussion about . . . [that] medical malpractice case that was going to go 3, 4, 5, 6 weeks . . . . I can remember it pretty well, where you said, "This way you can get your jury service out of the way."

What message does that send to jurors? That this is a . . . December inconvenience? That they are to get their duty out of the way? That's your words, Judge, "out of the way."

In the meantime, she's not here. [J.T.] is nowhere to be seen. You interact[ed] with these jurors and you talk[ed] about a judicial process with them without [defendant] present at the time.

Defense counsel urged the court to declare a mistrial and moved to admit the audio record of the November 28, 2011 ex parte proceedings into evidence. The judge did not formally rule on defendant's motion for a mistrial. When counsel sought to clarify what he believed was a clerical error in the manner the audio tape had been time-stamped, the judge reminded him that she had allowed him only "five minutes" to place his argument on the record. The judge then asked for the jury to be brought into the courtroom.

B

The trial judge's comments to the jury again became an issue on December 14, 2011, the sixth day of witness testimony. On this date, Juror Number 2 submitted a letter dated December 12, 2011, from her employer, the District Manager of a nationwide pharmacy

34                                                    A-4041-11T4

chain, requesting that she be excused from the trial the next day, December 15, 2011. According to the letter, the juror was the manager of a local outlet, and her "compensation [was] contingent on the profitability of the store." In the words of the prosecutor, "[i]t sounds like, if she doesn't work through the holiday season, she's not going to get paid as much as she normally would."

The prosecutor proposed that the judge question Juror Number 2 outside the presence of her fellow jurors "to see if she urged her boss to write the letter" and determine whether she can continue to serve as a juror in this case if her request was denied. When the judge asked defense counsel for his thoughts on the matter, counsel stated he viewed this juror's request as both a byproduct of the trial judge's initial mishandling of the jury selection process and an indication of how this threshold error prejudiced defendant's right to a fair trial:

> Well, Judge, actually this is a problem that was created basically two weeks ago . . . when you told the jury . . . when counsel wasn't present . . . that this case would be a short case [and that] this case would only be to the 15th. [They were] misinformed [about the probable length of the trial].
>
> So I suspect that she's one of maybe several, maybe many, who are now thinking the same . . . thing. Because, when you go back and look at it . . . we told them the 15th [and] today's the 14th . . . .

35

Although he believed the juror's request was legitimate because December "is a critical time" for retailers "[a]nd this poor lady . . . probably makes her money on an hourly basis or overtime[,]" defense counsel asserted that "we're now . . . [s]tuck." Before interviewing the juror, the judge stated: "I told them from the very beginning that this is not an excuse . . . to get off of jury service . . . because then we would have excused everyone . . . ."

Ultimately, the judge rejected the juror's request. In an attempt to justify her decision to deny the juror's request, the judge again mentioned the days available for her to return to work when the trial was not in session, the availability of other store employees to cover for her, and the letter the judge planned to send to the District Manager explaining the situation. The record shows, however, that Juror Number 2 repeatedly claimed that she was not aware that the trial could go beyond December 15, 2011.

The judge ended the exchange by asking the juror "not to discuss this with any of the other jurors." However, the judge did not ask the juror: (1) whether remaining on the jury beyond December 15, under these circumstances, constituted a financial hardship for her; (2) whether remaining on the jury despite her wishes to leave affected her ability to consider the evidence

fairly and objectively; and (3) whether she had discussed anything about the case with her District Manager or anyone else at her place of employment.

C

At the conclusion of the charge conference held on December 21, 2011, the judge told the attorneys that, despite her repeated admonitions to the jurors to not discuss the case among themselves, it had come to her attention, "from all different areas . . . that two jurors have been speaking to each other throughout the course of the trial." Although she did not know whether the two jurors were discussing matters related to the trial, the judge believed it was necessary to interview the two jurors separately and outside the presence of the remaining jurors. Both attorneys agreed this was the proper way to address this issue.

Defense counsel asked the judge to summarize what she intended to say to each juror. The judge noted that her main concern was to determine "what the discussions were about." Counsel responded that in addition to the substance of the jurors' conversations, it was also important to determine if their conversations had distracted them from "paying attention" to what was taking place during the trial. As framed by defense counsel: "If they are talking about lunch, . . . they're not paying attention to the

37

A-4041-11T4

witness."  The judge agreed to "inquire about that," but added: "I think we should take it one step at a time . . . ."

The judge addressed the issue the following day, December 22, 2011.  Before the two jurors were brought to the courtroom, defense counsel asked the judge to clarify, for the record, how this issue came to her attention.  After this discussion ended, the Sheriff's Officer brought Juror Number 11 to the courtroom where the following exchange ensued:

> THE COURT: Good morning.  How are you?  You're Juror No. 11.  It's come to my attention yesterday late in the day [after] you had already left.  All the jurors had already left.
>
> JUROR NUMBER 11: Yes.
>
> THE COURT: You're cognizant of my . . . rulings with regard to what the rules are about discussing the case.  Have you discussed the case with any of the other jurors . . . in any way?
>
> JUROR NUMBER 11: No.
>
> THE COURT:  Any of the facts or any of the testimony?
>
> . . . .
>
> JUROR NUMBER 11: No.
>
> . . . .
>
> THE COURT: [I]s . . . there anything about what happened yesterday that would affect your ability to be fair and impartial?

JUROR NUMBER 11: What happened yesterday?

THE COURT: Well, with --

JUROR NUMBER 11: I just needed to leave on --

THE COURT: No. Just it came to my attention that you were speaking to another juror in the jury box.  So is there anything that you were discussing --

JUROR NUMBER 11: Oh, no.

THE COURT: -- with regards to the facts of the case or the testimony?

JUROR NUMBER 11: We were kind of -- it was amusing what was happening yesterday seemed like a theater.

THE COURT: Okay.  It was amusing . . . the last part of the testimony?

JUROR NUMBER 11: Yes.

THE COURT:  When everybody else --

JUROR NUMBER 11: With Santa and --

THE COURT: When everybody else in the jury box was also laughing?

JUROR NUMBER 11: Yeah.

After Juror Number 11 left, but before the Sheriff's Officer brought the next juror into the courtroom, defense counsel noted that the judge did not point out to Juror Number 11 that "everybody saw them talking all day long.  [Y]our question simply directed her to the end of the day."  Counsel argued that the judge should have asked Juror Number 11: "[W]hat were you talking about . . .

A-4041-11T4

all day?" The judge explained that Juror Number 11 found amusing "the testimony was about Santa, and we were discussing the fact that we needed a break." Defense counsel argued the questions asked by the judge were inconsistent with the opened-ended approach agreed to by the parties.

The prosecutor disagreed "that the two jurors were talking to each other throughout the day." The prosecutor claimed that based on defense counsel's "body position," she was not able to see the witnesses as they testified. The prosecutor stated, "so I basically just started looking at the jury for an hour, or two hours . . . . And frankly, I did not see two jurors talking to each other continually while there was testimony." This triggered an active discussion between defense counsel and the judge about the meaning of the judge's earlier statement that her "staff" had seen two specific jurors leaning in and talking to each other while the trial was in progress.

Defense counsel then asked the judge to recall Juror Number 11 so the judge can inquire further about the nature and substance of her interactions with her fellow juror. The judge brought Juror Number 11 back to the courtroom and asked her the questions suggested by defense counsel. The juror consistently denied talking to Juror Number 10 about anything to do with the trial "throughout the course of the day." In response to the judge's

40

question, Juror Number 11 reaffirmed her ability to judge the evidence in the case fairly and impartially.

After overruling defense counsel's objections, the judge brought Juror Number 10 into the courtroom and engaged in the following colloquy on the record at sidebar, but outside the presence of defendant and the attorneys:

> THE COURT: I just wanted to let you know that throughout the course of the trial it came to my attention through, you know, various sources that you may have been discussing the case with some of the other jurors or juror. Have you been discussing anything? Have you been talking about anything?
>
> JUROR NUMBER 10: No. Other than people's shoes that they're wearing in court and stuff like that.
>
> THE COURT: Okay. What about Juror No. 11, have you been discussing anything with her about the case or anything? Just tell me what the topics are.

Juror Number 10 denied talking to Juror Number 11 about anything to do with the trial. She noted: "I'm with these people every day. Obviously we talk to each other." Finally, Juror Number 10 told the judge that her mind "wanders" after sitting for three hours straight. She suggested that the court take more frequent breaks. The judge told her to raise her hand "if you need a break." The juror reaffirmed her ability to judge the evidence fairly and impartially. The interview with the juror was

41

recorded and played back to the attorneys and defendant at defense counsel's request.

Defense counsel objected to the manner the judge conducted what counsel characterized as a "private conversation" with Juror Number 10, outside the presence of defendant. Although the judge attempted to accommodate defense counsel's objections by playing back the audio recording of the interview, the equipment malfunctioned. The judge was thus compelled to recall Juror Number 10. The juror again affirmed that the conversations she had with her fellow jurors involved innocuous topics like Christmas shopping, her children, and her work. She unequivocally denied discussing any aspect of the case and again emphasized the need for more frequent breaks because she had "a very short attention span." The judge conducted this interview in open court, in the presence of defendant and the attorneys.

Defense counsel noted that this time, the juror was not asked any questions about her ability to be able to remain fair and impartial. Defense counsel characterized this omission as the "gravamen of what the original complaint was when we started this process." The prosecutor argued that both jurors answered the court's questions candidly and forthrightly. There was no evidence that the jury had been exposed to any extraneous information that could compromise the deliberative process or that these two

42

particular jurors had done anything improper. After considering the arguments of counsel, the judge found no basis to remove Jurors Numbers 10 and 11.

## III

Our analysis of the trial judge's initial ex parte interactions with the pool of prospective jurors is guided by certain bedrock principles. These fundamental tenets of jury trial management were succinctly explained by Justice LaVecchia on behalf of a unanimous Supreme Court in <u>Davis v. Husain</u>, 220 N.J. 270 (2014):

> Generally stated, avoiding the aura of irregularity that arises from ex parte judge-juror interactions has always been a goal in and of itself. Canon 3 of the Code of Judicial Conduct exhorts judges to "perform the duties of judicial office impartially and diligently," and specifically states, under adjudicative responsibilities identified in Canon 3(A)(6), that "[a] judge should accord to every person who is legally interested in a proceeding, or that person's lawyer, full right to be heard according to law, and, except as authorized by law, <u>neither initiate nor consider ex parte or other communications concerning a pending or impending proceeding</u>."
>
> [<u>Id.</u> at 285 (alteration in original) (emphasis added).]

The issue in <u>Davis</u> concerned a trial judge's ex parte interactions with jurors <u>after</u> the jury had rendered its verdict, conduct that the Court strongly criticized and expressly

prohibited under its constitutional supervisory authority over civil and criminal trials. Id. at 285-86 (first citing N.J. Const. art. VI, § 2, ¶ 3; and then Pasqua v. Council, 186 N.J. 127, 152 (2006)). See also R. 1:16-1.[10]

In the spectrum that encompasses all of the probable points of contact between trial judges and jurors, there is an origination point and an end point. The ex parte interactions the Supreme Court found highly inappropriate in Davis involved the end point of this spectrum; the jury as a body had rendered its verdict. The ex parte interactions that occurred here were at the origination point, before the jury selection process had even begun. In this context, our task is to determine how and to what extent the judge's ex parte interactions at this embryonic phase of the proceedings jeopardized defendant's right to a fair trial.

Although no reported decision has addressed the propriety of ex parte interactions between a trial judge and a pool of prospective jurors, the ethical principles articulated by the Court in Davis apply with equal force here. In Davis, the Court emphasized the need to avoid "an aura of irregularity that arises

---

[10] Rule 1:16-1 provides: "Except by leave of court granted on good cause shown, no attorney or party shall directly, or through any investigator or other person acting for the attorney, interview, examine, or question any grand or petit juror with respect to any matter relating to the case."

from ex parte judge-juror interactions . . . ." <u>Davis</u>, 220 N.J. at 285.  The Court cited a judge's ethical responsibilities under Canon 3 of the Code of Judicial Conduct to carry out judicial functions in a manner that exhibits impartially.  <u>Ibid.</u>  These ethical obligations are consistent with the clear mandate of <u>Rule</u> 3:16(b), which expressly gives a defendant the right to be present "at every stage of the trial, including the impaneling of the jury[.]"

We thus hold that the injunction imposed by the Court in <u>Davis</u> against judges engaging in ex parte interactions with jurors after the trial has concluded applies with equal force to any ex parte interactions with prospective jurors, even those that occur before the jury selection process has begun.  Stated more emphatically, there is no place for ex parte communications between a trial judge and the jurors at any stage of the trial process.  As the Court held in <u>Davis</u>:

> During the pendency of the trial, the rules speak with crystal clarity. <u>Rule</u> 1:2-1 controls judge and jury interactions, and it provides that "[a]ll trials, hearings of motions and other applications, pretrial conferences, arraignments, sentencing conferences . . . and appeals shall be conducted in open court unless otherwise provided by rule or statute."
>
> [<u>Davis</u>, 220 N.J. at 280 (alterations in original).]

We now turn to determine whether this judicial error had the capacity of denying defendant her constitutional right to a fair trial. "[A] trial judge's interactions with the jury must be 'guided by a concern for the weighty role that the judge plays in the dynamics of the courtroom.'" State v. Gleaton, 446 N.J. Super. 478, 523 (App. Div. 2016) (quoting State v. Ross, 218 N.J. 130, 145 (2014)). Here, the judge's decision to interact ex parte with the prospective jurors showed extremely poor judgment on the judge's part and revealed the judge's failure to appreciate the significance of the judge's role in a jury trial. However, as valid as these concerns may be, the key question here is whether the judge's ex parte interactions warrant the reversal of defendant's conviction. The answer to this question must be based on a fact-sensitive analysis.

A judge's improper ex parte interactions with a jury "does not automatically require" the reversal of a jury's verdict. State v. Morgan, 217 N.J. 1, 12 (2013) (quoting State v. Brown, 275 N.J. Super. 329, 332 (App. Div. 1994)). Writing for the Court in Morgan, Chief Justice Rabner reaffirmed the three-part test for evaluating a judge's inappropriate communications with a jury:

> (1) if the record affirmatively reveals that the defendant was prejudiced, reversal is required; (2) if the record does not show whether the ex parte contact was prejudicial, prejudice is presumed; and (3) if the record

affirmatively    discloses    "that    the
communication had no tendency to influence the
verdict," the outcome should not be disturbed.

[Ibid. (quoting State v. Auld, 2 N.J. 426, 432
(1949)).]

After carefully reviewing the record and mindful of the Morgan/Auld three-part test, we conclude there is insufficient evidence from which to find that the judge's ex parte communications with the prospective jurors had a tendency to influence the jury's verdict. We are nevertheless very troubled by the way the trial judge acted in this case. Because there are no reported opinions from any court in this State addressing this issue, and as part of our didactic role as an intermediate appellate court, we will review the areas where the judge erred as a means of preventing their recurrence.

As a starting point, we conclude the trial judge had an affirmative, ethical duty to disclose to the prosecutor and defense counsel that she had ex parte interactions with the pool of prospective jurors. This ethical duty to disclose is firmly grounded in the Court's admonition in Davis to avoid "the aura of irregularity that arises from ex parte judge-juror interactions" and the Canon 3 of the Code of Judicial Conduct. Davis, 220 N.J. at 285. Here, the judge's failure to disclose her interactions with the prospective jurors cast a shadow of suspicion and secrecy

over the jury selection process. We find particularly problematic the judge's failure to make clear to the attorneys that during this ex parte exchange, the judge: (1) referred to the case by defendant's name and indictment number; (2) made repeated factually unwarranted prognostications about the length of the trial; (3) used language that conveyed an aura of levity regarding jury service; and (4) suggested that serving as a juror on this case would not be as demanding as serving in a medical malpractice trial.

When viewed through the prism of the tragic, graphic facts of this case, these comments were particularly inappropriate and insensitive. The judge's comments estimating the case was likely to take only "three to four days" could have been construed by a rational juror as an indication of the judge's insightful assessment of defendant's guilt. As the Supreme Court has noted: "Trial and appellate courts acknowledge that juries, witnesses, and other trial participants accord great weight and deference to even the most subtle behaviors of the judge." State v. Figueroa, 190 N.J. 219, 238 (2007) (quoting Peter David Blanck, What Empirical Research Tells Us: Studying Judges' and Juries' Behavior, 40 Am. U.L. Rev. 775, 777 (1991)).

Furthermore, the judge's initial reluctance to acknowledge to defense counsel that she engaged in this conduct and made these

comments only served to exacerbate this "aura of irregularity." Even after one of the prospective jurors was excused after admitting that he had researched defendant's name on the internet the previous night, the judge continued to claim she had no recollection of mentioning defendant's name the previous day during the ex parte interaction with the jurors. The judge did not concede this error until defense counsel confronted her with the audio recording of the ex parte exchange. However, even after these issues were brought to her attention, the judge did not make any attempt to mitigate the potential prejudice these comments could have caused.

As the record shows, the judge's ex parte interactions definitively adversely affected Juror Number 2. Six days after trial testimony began, the judge received a letter from this juror's employer, requesting the judge to release Juror Number 2 from serving on this case. In response to the judge's questions, this juror testified that she specifically relied on the judge's ex parte prognostication, made on November 28, 2011, that the "criminal case . . . should only take three to four days[.]" After questioning the juror directly and discussing the matter with counsel, the judge denied the juror's request.

As agreed by counsel, the judge told the juror that the court would write a letter to her District Manager explaining why she

49

could not be released from the jury. This gesture, of course, did not compensate the juror for the time she was missing from work during this revenue-intensive time of year. The record also shows that in response to the judge's question, Juror Number 2 reaffirmed her ability to review the evidence fairly and impartially and to follow the judge's instructions on the law. Juror Number 2 was one of the jurors who deliberated and ultimately found defendant guilty.

From this record, we do not have a rational basis to conclude this incident tainted the jury's verdict. Even when considered from the perspective of their cumulative effect, a new trial would have been warranted only if these errors "could have a tendency to influence the jury in arriving at its verdict in a manner inconsistent with the legal proofs and the court's charge." Panko v. Flintkote Co., 7 N.J. 55, 61 (1951). Stated differently, "[t]he test is not whether the irregular matter actually influenced the result, but whether it had the capacity of doing so." Ibid. We conclude the errors the judge committed here do not give us sufficient grounds to set aside the jury's verdict. That said, it is obvious to us that the financial hardship endured by Juror Number 2 could have been easily avoided had the judge, after consulting with counsel, given the prospective jurors a reasonably accurate estimate of the length of the trial.

Jury service is one of our most important and cherished constitutional rights. "Indeed, with the exception of voting, for most citizens the honor and privilege of jury duty is their most significant opportunity to participate in the democratic process." Powers v. Ohio, 499 U.S. 400, 407 (1991). As the guardian of that right, "the trial judge is entrusted with the responsibility of controlling courtroom proceedings and is bounded by the law and the rules of the court." Gleaton, 446 N.J. Super. at 514 (quoting State v. Dorsainvil, 435 N.J. Super. 449, 480-81 (App. Div. 2014)). Here, the trial judge failed to carry out this responsibility.

IV

Expert Witness Testimony

Dr. Jennifer Swartz, Bergen County Deputy Medical Examiner, conducted M.T.'s autopsy and participated in the crime scene investigation. Based on decedent's body temperature at the time the police officers arrived at the scene and the condition of his body, Dr. Swartz estimated that he died of asphyxia due to suffocation between three and five o'clock in the morning of March 29, 2009.

Dr. Robert T. Latimer testified on defendant's behalf as an expert in forensic psychiatry. Dr. Latimer met with defendant on April 6, 2009, and again on January 29, 2010. After an initial evaluation to assess defendant's competency to stand trial, Dr.

Latimer concluded that defendant could not proceed to trial at the time. He described defendant as "highly confused, distracted, depressed" and unable to "intelligently appraise the circumstances and her condition." According to Dr. Latimer, defendant did not seem to understand why he had come to see her or what his function was in these proceedings. Dr. Latimer testified that he was unable to get information from defendant; she was "like a robot" and talked "like a mechanical artifact." After their first meeting, Dr. Latimer assigned her a GAF score of ten, and diagnosed her as suffering from a brief psychotic disorder.

As Dr. Latimer explained, the disorder would feature disorganized behavior, delusions, depression, homicidal and suicidal thinking and noted the incoherence in defendant's police statement. He opined that the incidents described by Maple Glen staff, her family's concerns, her constant depression, and her remarks about killing herself and M.T., were all signs of her psychosis. Based on his review of the record, including materials and conversations he had with defendant's family members, Dr. Latimer opined defendant had an obsessive compulsive personality. He also believed that she had been decompensating and was unable to cope with her husband's illness. In his opinion, defendant's inability to control the circumstances spiraling around her,

coupled with the stressors related to M.T.'s illness, made her deranged.

As a clinical term, Dr. Latimer defined "delusion" as "a false belief that is elaborated in the mind of the person by a process of mental illness" that is impermeable to logic. In his view, defendant's delusion was her belief that she was going to fix the family's problems by taking everyone to "a better world." He thus opined that when defendant killed her husband, she was

> suffering from a mental disease as a result of which she was unable to understand that what she was doing was wrong. And she was unable to understand the consequences of those acts. That she wasn't going to take him to a better place. That she was killing him. And you can't do that. She was unable to understand the wrongfulness. It would have been wrong in her mind to let him suffer. It would have been wrong in her mind to go with him and leave the kids alone. These were her abnormal psychotic ideas of what was wrong . . . . She had no concept of wrongfulness at the time. She was at the end of [her] rope . . . .

The court admitted Dr. Steven Simring as the State's mental health expert. He met with defendant on July 1, 2010. Dr. Simring disagreed with Dr. Latimer's medical findings and diagnosis that defendant was clinically delusional and depressed when she killed her husband. In Dr. Simring's opinion, defendant was merely "upset and frustrated" and "angry." Although he noted that defendant had obsessive traits, Dr. Simring opined she was markedly histrionic,

theatrical, narcissistic and "self-centered . . . more than the average person." He did not find that those traits were so elevated as to constitute a psychiatric disorder. Dr. Simring characterized the GAF score of ten that Dr. Latimer assigned to defendant as "absurd." He acknowledged, however, that the admitting physician at Bergen Regional had also assigned defendant a GAF score of ten and specifically noted psychotic features.

Defendant argues that Dr. Simring improperly opined upon the ultimate issue of defendant's guilt. Defendant also contends that his presence in the courtroom violated the court's sequestration order. However, because defendant did not raise these issues before the trial court, we must review these arguments under the plain error doctrine. R. 2:10-2. This means we must disregard these arguments unless they are "of such a nature as to have been clearly capable of producing an unjust result . . . ." Ibid.

We will address the "ultimate issue" argument first. The record shows that as part of his direct testimony, the prosecutor asked Dr. Simring the following questions:

> Q. And Doctor . . . do . . . you know the legal standard or legal definition of insanity in the State of New Jersey . . . ?
>
> A. Legal insanity and diminished capacity, yes.
>
> Q. Okay. Why don't you start first with legal insanity. Tell us what your professional

opinion is based on with a reasonable degree of medical certainty.

A. Well, the Judge will charge you on legal insanity, so I'm going to be very careful not to overstep my . . . bounds. I'm just telling you what I have found, and the way I see it. Ultimately, you will reach that decision based on the Judge's charge.

Legal insanity . . . contains two parts. One, Part A, you have to have a serious mental illness. And then, Part B, it has to lead to something. Now the Legislature . . . or the law never specifies in this State or any other state exactly what the illness is supposed to be. That's left to the professionals. But it has to be serious.

. . . .

As a result of that serious mental illness -- that's' Part A. Part B is that either you didn't know the nature or quality of your act, or, B, that you didn't know it was wrong. Now that means that a person suffering say from schizophrenia or a serious bipolar disorder, which are serious mental illnesses, or even a genuine brief psychotic disorder would meet Part A if they have the serious mental illness. But that alone is not enough.

They then have to show how that illness deprived them of one of three things. They didn't know the nature of the act. They had a gun, for example, and they didn't know it was a gun. They thought it was a toy. Or they had a bag, and they didn't know it was a bag. They thought it was something else. They didn't know the quality of the act. And that means they thought that by putting the bag over the mouth, they thought it was giving oxygen. And this is not necessarily because of low intelligence. It could be because of

a delusion.  God told you this bag has oxygen.
And this happens.

Or, number three, because of this mental
illness, you did what you did because you
thought it was right.  And the . . . clearest
example of that is . . . someone who say shoots
a stranger because he believes that the
stranger has this water bottle, and this is a
gun, and sees the gun, and genuinely hears God
telling him it's a gun, and shoots this
stranger in what he believes to be self-
defense.  Self-defense is not wrong.

So it is my testimony that [defendant]
does not meet any of the prongs of the insanity
defense.  She does not have a significant
mental illness.  She was certainly upset and
overwhelmed, but that's not [an] illness.  She
knew the nature of the act.  That this was a
bag.  She knew what a bag could do.  In fact,
that was her specific intent.  And she knew
that what she was doing was wrong, even if she
at that point thought she had good
justification.

As defined in our Criminal Code, insanity excuses a defendant

from being responsible for the crime.  The Code defines legal

insanity as follows:

A person is not criminally responsible
for conduct if at the time of such conduct he
was laboring under such a defect of reason,
from disease of the mind as not to know the
nature and quality of the act he was doing,
or if he did know it, that he did not know
what he was doing was wrong.

[N.J.S.A. 2C:4-1.]

As an affirmative defense, defendant has the burden to prove,

by a preponderance of the evidence, that she "was laboring under

such a defect of reason, from disease of the mind as not to know the nature and quality of the act [she] was doing, or if [she] did know it, that [she] did not know what [she] was doing was wrong." Ibid. Although the statute does not define "preponderance of the evidence," the model charge on "insanity" includes the following definition:

> The term "preponderance of the evidence" means the greater weight of credible evidence in the case. It does not necessarily mean the evidence of the greater number of witnesses but means that evidence which carries the greater convincing power to your minds.
>
> Keep in mind, however, that although the burden rests upon the defendant to establish the defense of insanity by a preponderance of the credible evidence, the burden of proving the defendant guilty of the offense charged here beyond a reasonable doubt is always on the State, and that burden never shifts.
>
> [Model Jury Charges (Criminal), "Insanity (N.J.S.A. 2C:4-1)" (approved Oct. 17, 1988).]

Distilled to its essence, "one who meets the test for insanity, that is, one who lacks the ability to distinguish between right and wrong, is thereby excused from criminal culpability." State v. Gorthy, 226 N.J. 516, 533 (2016) (quoting State v. Handy, 215 N.J. 334, 357 (2013)).

In State v. Singleton, 211 N.J. 157, 177 (2012), the Court revisited its holding in State v. Worlock, 117 N.J. 596, 610 (1990), and reaffirmed "that legal and moral wrong are usually

'coextensive,' especially when the criminal act at issue is murder . . . ." Singleton, 211 N.J. at 177. The Court also noted that "in the odd case in which a defendant is able to recognize that his actions are legally wrong but is nonetheless incapable of understanding that they are morally wrong, we held that 'the court should instruct the jury that 'wrong' encompasses both legal and moral wrong.'" Ibid. (quoting Worlock, 117 N.J. at 611).

Here, there is no question that expert psychiatric testimony was properly admitted under N.J.R.E. 702 because psychiatry, as a field of medicine, is beyond the ken of the average juror. Psychiatric testimony was necessary to assist the jury in determining whether, at the time she took her husband's life, defendant was "laboring under such a defect of reason, from disease of the mind as not to know the nature and quality of the act . . . or if [defendant] did know it, that [she] did not know that what [she] was doing was wrong." N.J.S.A. 2C:4-1. See also State v. Odom, 116 N.J. 65, 71 (1989).

In State v. Simms, 224 N.J. 393, 396 (2016), the Court reaffirmed its holding in Cain, that "an expert's opinion on the defendant's state of mind encroaches on the exclusive domain of the jury as trier of fact." Simms, 224 N.J. at 396. Here, the prosecutor asked Dr. Simring to explain to the jury the concept of "legal insanity" and then to opine on whether defendant's

conduct satisfied the elements of this affirmative defense. As the following excerpt from Dr. Simring's testimony shows, the State's expert witness' response usurped the jury's role by making a definitive declaration of this jury question:

> [Defendant] does not meet any of the prongs of the insanity defense. She does not have a significant mental illness. She was certainly upset and overwhelmed, but that's not [an] illness. She knew the nature of the act. That this was a bag. She knew what a bag could do. In fact, that was her specific intent. And she knew that what she was doing was wrong, even if she at that point thought she had good justification.
>
> [(Emphasis added).]

In Cain, the Supreme Court reaffirmed its prior holding in State v. Reeds, 197 N.J. 280, 284-85 (2009), that an expert's "ultimate-issue testimony" usurps the "jury's singular role in the determination of defendant's guilt and irredeemably taints the remaining trial proofs." Cain, 224 N.J. at 424 (quoting Reeds, 197 N.J. at 300). Although defense counsel did not object at the time Dr. Simring gave this testimony, this colossal error was clearly capable of producing an unjust result.

Defendant had lived a conventional, law abiding life until the day she suffocated her husband, and attempted to kill herself and her two children. The evidence presented to the jury at trial showed this aberrational behavior by defendant was preceded by a

stroke suffered by her then fifty-year-old husband that left him paralyzed and completely dependent on defendant for all of his needs. M.T.'s devastating health crisis also had catastrophic financial consequences on the family. Defendant was the only income-producing person; M.T.'s immediate and long-term needs were not covered by insurance or Medicaid. A number of witnesses at trial described defendant's behavior on the days leading to her husband's discharge from the rehabilitation facility as obsessively preoccupied with the numerous problems, both practical and financial, associated with M.T.'s homecare.

The enormity of these problems became manifest to defendant on the day M.T. arrived home after he was discharged from the rehabilitation facility. Defendant's burden of proof under the insanity defense required her to convince the jury that the greater weight of credible evidence showed that she was not mentally capable of distinguishing right from wrong when she committed these horrific crimes. Dr. Simring's testimony usurped the jury's exclusive role to determine whether defendant satisfied her burden of proof. The fact that the jury was allowed to consider this critically improper testimony denied defendant her right to a fair trial.

A-4041-11T4

V

Based on this conclusion, we do not reach defendant's remaining arguments. Defendant's conviction is reversed. The matter is remanded to the Criminal Part for retrial or for such other disposition as may be warranted. We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-4041-11T4