**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2242-19

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

ARTHUR LOMANDO,

      Defendant-Appellant.

_____

Argued February 13, 2024 – Decided May 5, 2025

Before Judges Gooden Brown and Natali.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Indictment No. 16-04-0486.

Robert Carter Pierce, Designated Counsel, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Robert Carter Pierce, on the brief).

Ian C. Kennedy, Assistant Prosecutor, argued the cause for respondent (Mark Musella, Bergen County Prosecutor, attorney; Ian C. Kennedy, of counsel and on the briefs).

Appellant filed a pro se supplemental brief.

The opinion of the court was delivered by

GOODEN BROWN, J.A.D.

Following a jury trial, defendant Arthur Lomando was convicted of murder and related offenses. He was sentenced to an aggregate term of life imprisonment, subject to an eighty-five percent period of parole ineligibility pursuant to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, plus a consecutive five-year term in prison. The convictions stemmed from defendant fatally stabbing his estranged girlfriend, S.B.,[1] approximately thirty times while she was sitting in her car in the driveway of her Midland Park home talking on the phone to a friend. The brutal stabbing was captured on S.B.'s home security surveillance system.

Defendant then drove to Manhattan where he threw himself in front of a subway train in an unsuccessful suicide attempt. While defendant was being evacuated to a local hospital by emergency personnel, a responding New York City police officer who was unaware of the New Jersey homicide retrieved defendant's cell phone without a warrant to establish his identity and notify

---

[1] We refer to the victim and civilian witnesses by their initials to protect the victim's identity pursuant to Rule 1:38-3(c)(12).

A-2242-19

relatives. The officer discovered a suicide note on the phone in which defendant confessed to the murder to his family.

In the days and weeks leading up to the murder, defendant committed acts of domestic violence, causing the victim to obtain a restraining order that resulted in the filing of a related criminal complaint against defendant for its violation. At trial, defendant did not dispute killing the victim in the ultimate act of domestic violence but advanced a diminished capacity defense, resulting in a battle of the experts.

On appeal, in his counseled brief, defendant raises the following points for our consideration:

> POINT I
>
> THE STATE'S EXPERT WITNESS IN FORENSIC PSYCHIATRY IMPERMISSIBLY OPINED ON THE ULTIMATE ISSUE OF GUILT, WHICH USURPED THE JURY'S EXCLUSIVE ROLE TO DECIDE THIS CRITICAL FACTUAL ISSUE, THUS REQUIRING [DEFENDANT'S] CONVICTION TO BE REVERSED[] (NOT RAISED BELOW)[.]
>
> POINT II
>
> THE TRIAL COURT ERRED BY NOT TAILORING THE MODEL JURY CHARGE ON DIMINISHED CAPACITY TO INCLUDE THE INSTRUCTION, "ALL MENTAL DEFICIENCIES, INCLUDING CONDITIONS THAT CAUSE A LOSS OF EMOTIONAL CONTROL MAY SATISFY THE

DIMINISHED CAPACITY DEFENSE IF THEY DID IN FACT AFFECT THE DEFENDANT'S COGNITIVE CAPACITY."

POINT III

THE PROSECUTOR COMMITTED MISCONDUCT DURING SUMMATION BY MISSTATING THE LAW ON [DEFENDANT'S] DIMINISHED CAPACITY DEFENSE, WHICH DEPRIVED [DEFENDANT] OF A FAIR TRIAL.

POINT IV

THE TRIAL COURT ERRED BY NOT GRANTING [DEFENDANT'S] MOTION FOR A MISTRIAL AFTER THE PROSECUTOR'S IMPROPER ULTIMATE CULPABILITY QUESTIONS DURING THE STATE'S CROSS[-]EXAMINATION OF THE DEFENSE FORENSIC PSYCHIATRIST.

POINT V

THE TRIAL COURT ERRED BY NOT GRANTING [DEFENDANT'S] MOTION FOR A NEW TRIAL.

POINT VI

THE TRIAL COURT ERRED BY DENYING [DEFENDANT'S] MOTION FOR A MISTRIAL BECAUSE THE STATE'S FORENSIC PSYCHIATRIST READ STATEMENTS OF WITNESSES THAT DID NOT TESTIFY AT TRIAL AND THEN USED THE STATEMENTS AS SUBSTANTIVE EVIDENCE OF [DEFENDANT'S] GUILT.

4

POINT VII

THE SENTENCE IMPOSED WAS MANIFESTLY
EXCESSIVE.

In his pro se supplemental brief, defendant makes the following argument:

POINT I

[THE] TRIAL COURT ERRED BY ALLOWING
[DEFENDANT'S] CELL PHONE (516) [***-****] TO
BE ADMITTED INTO EVIDENCE,
DISREGARDING SGT. CHEN'S (NYPD) ILLEGAL
SEARCH [AND] SEIZURE[.]

Having reviewed the extensive record, the parties' arguments, and the applicable legal principles, we affirm.

I.

On April 25, 2016, defendant was charged in a Bergen County indictment with first-degree murder, N.J.S.A. 2C:11-3(a)(1) to (2) (count one); third-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(d) (count two); fourth-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(d) (count three); third-degree hindering apprehension, N.J.S.A. 2C:29-3(b)(1) (count four); fourth-degree stalking, N.J.S.A. 2C:12-10(b) (count five); third-degree stalking in violation of an existing restraining order, N.J.S.A. 2C:12-10(c) (count six); third-degree witness tampering, N.J.S.A. 2C:28-5

(count seven); and fourth-degree contempt for violating a restraining order, N.J.S.A. 2C:29-9(b) (count eight).

After extensive pre-trial motion practice, a multi-day jury trial was held on various dates in January and February 2019 on all counts except for count five, which was severed and later dismissed. During the trial, the State produced nineteen witnesses consisting of civilians, law enforcement officers, and experts. The defense produced five witnesses, including a psychiatric forensic expert. Defendant did not testify at trial. We glean these facts from the trial record.

Defendant and S.B. began a romantic relationship around 2013. S.B. was a single mother of two and a special education teacher at a school in Teaneck. Defendant was a New York City police officer for ten years until he was terminated in 2003 due to "psychiatric problems," among other reasons. Prior to being fired, defendant was treated for depression and diagnosed with post-traumatic stress disorder (PTSD) after responding to the World Trade Center following the 2001 terrorist attack.[2]

---

[2] Defendant's ten-year marriage ended in divorce around the same time he left the police department.

By the summer of 2015, defendant and S.B.'s relationship had become a "rollercoaster." In the latter part of September 2015, defendant was "very depressed." After threatening suicide in a text message to his father, defendant checked himself into a psychiatric hospital and remained there for two weeks. His father testified that defendant remained depressed during the first three weeks of October 2015.

By the latter part of 2015, defendant and S.B.'s relationship was coming to an end. Witnesses who observed the parties' volatile relationship testified that S.B. was afraid of defendant and feared for her safety. On October 5, 2015, S.B. obtained a temporary restraining order (TRO) against defendant. The TRO barred defendant from communicating with S.B., directly or indirectly, going to her residence or place of employment, or possessing weapons. The TRO also provided notice of a final hearing scheduled for October 19, 2015. The TRO was served on defendant at 9:20 p.m. on October 5, 2015.

The following day, October 6, 2015, a man who identified himself as "Art" telephoned the principal of the school where S.B. worked and made disparaging comments about S.B. The man told the principal that S.B. was sending inappropriate messages to students on Facebook and that S.B. had made racist comments about students and staff. The same individual also sent the principal

7

emails with nude photographs of S.B. and screenshots of text messages containing racial slurs that S.B. had allegedly sent to defendant. In actuality, defendant had sent the messages to himself using a "burner phone" registered in S.B.'s name.

Subsequently, S.B. went to the Midland Park Police Department and reported that defendant had violated the TRO in a variety of ways. As a result, a criminal complaint was filed alleging defendant violated the TRO by: (1) arranging for Southwest Airlines to send her confirmation emails for plane tickets he had purchased; (2) asking her friend on Facebook to try to convince her to drop the TRO; and (3) calling her cellphone from an unknown number and sending her a text message containing another nude photograph of her.

On October 9, 2015, defendant asked L.M., a woman he had dated who was also friendly with S.B., to relay a request for S.B. to "drop the restraining order." L.M., who was in frequent contact with S.B., complied.

On October 10, 2015, around 6:00 a.m., the police found defendant's vehicle "one block away" from S.B.'s house. Inside the vehicle were "a sledgehammer and duct tape." A search for defendant in the surrounding area yielded negative results. The same day, defendant turned himself into the police

A-2242-19

after learning there was an outstanding warrant for his arrest for violating the TRO. Defendant posted bail, and the police released him from custody.

On October 19, 2015, the final restraining order (FRO) hearing was adjourned. Both parties appeared in court, but S.B. rebuffed defendant's attempt to speak to her at the courthouse. That afternoon, defendant purchased a military-grade "tactical knife" from a store in Port Jefferson, New York.

Expert testimony later established that defendant's internet browsing history from October 19 to 22, 2015, included the following internet searches or website titles: "how long does it take to get over a breakup," "[h]ow to get your ex back permanently, five step plan," "[i]s it possible to win your ex back after the police got involved," "deadly knife wounds," "stab wounds fatal through eye or under chin," "how deep do stab wounds have to be to be lethal," "[h]ow long does it take to die from a stab wound to the stomach," and "how to kill without joy, the complete how to kill book."

On the morning of October 22, 2015, defendant spoke to L.M. and told her that he was going to try to "bury" S.B. by "get[ting] her in trouble at her job." Later that day, at about 1:30 p.m., defendant rented a car for one day from a rental agency in Hackensack. The rental agent testified that defendant

9

specifically requested a vehicle "with New Jersey [license] plates."  Defendant left his Jeep with a New York license plate at the agency.

Defendant's attorney in the domestic violence case spoke to defendant by phone at 2:26 p.m. the same day.  The attorney told him that S.B. planned to continue the TRO because she was "very afraid of . . . defendant."  The attorney also informed defendant that he might be charged with another violation of the TRO based on defendant's interaction with S.B. in the courthouse, which would result in a warrant for his arrest and increased cash bail.  Defendant became "very upset" upon learning that the TRO might become permanent.

At about 3:00 p.m. later that day, S.B. called L.M. while S.B. was driving home from work.  After S.B. said she was pulling into her driveway, L.M. heard S.B. "yelling."  S.B. screamed, "[O]h my God, no," and then a man's voice said, "I'm sorry I have to do this to you."  After the screaming, there was silence. L.M. called back, but there was no answer.  She then "called [9-1-1]."  A recording of the 9-1-1 call was played for the jury.

Upon responding to the 9-1-1 call, Midland Park Police Officer Mark Steven Berninger found S.B.'s motionless body lying in her vehicle with her feet protruding out the driver's side window.  She had multiple stab wounds to her face, neck, chest, arms, and legs.  There were "blood stains throughout the

vehicle," "broken glass from the driver's side window" inside and outside the vehicle, a black "tactical armored" glove recovered in front of a neighbor's house, and a tactical knife found next to S.B. in the vehicle.

The knife was described as "a machete tactical Bowie knife," "a little over [fifteen] inches long" with "a blade of approximately . . . [ten] inches." Both S.B.'s and defendant's DNA were found on the knife and steering wheel, and S.B.'s DNA matched the blood found on the glove. An autopsy revealed that S.B. sustained approximately thirty stab wounds. Her death was caused by a stab wound "to the chest that injured the heart and the lungs and caused internal bleeding."

The police recovered a video from a video surveillance system that S.B. had installed in her house. The footage from that afternoon showed defendant "arrive[] at the residence and . . . stand[] on the side of the house, pac[ing] back and forth." Thereafter, S.B. pulled into her driveway and parked. Defendant approached S.B.'s vehicle wearing "a black glove on his right hand" and holding a "machete[-]type knife." He smashed the car window with the knife and stabbed S.B., who attempted to defend herself by kicking defendant until she "stopped moving." He then fled the scene. In the video, which was played for the jury, defendant appeared to calmly walk away.

Immediately after the murder, defendant drove into Manhattan, parked the rental car,[3] and jumped in front of a subway train at the 168th Street station at approximately 4:25 p.m. Defendant survived without any head trauma, but lost both of his legs as a result of the impact.

Sergeant Willup Chen, a patrol sergeant with the New York City Police Department (NYPD), responded to the train station shortly after the incident. He saw defendant being evacuated by first responders and transported to the hospital. Another NYPD officer gave Chen defendant's cell phone that had been retrieved from his person. As defendant had not yet been identified, Chen searched through the phone for defendant's contact information to establish his identity and notify his relatives. Chen discovered a text message addressed to defendant's family in which defendant confessed to killing S.B. and stated that he planned to take his life.

The text message read in part:

> I did something today I can't take back. I killed [S.B.] because she piled more charges on. I begged everyone not to listen to her lies . . . . They all took it as I was wrong. . . . I feel [S.B.] forced my hand and I'm not going [to] jail for lies so at least now I deserve my fate. . . . By the time you read this I will be dead. . . .

---

[3] Both S.B.'s and defendant's DNA were found in blood stains on the steering wheel of the rental car. A black left-hand glove that matched the glove found at the crime scene was also found in the rental car.

A-2242-19

> [W]omen always brought me down with lies and deceit. . . . I was healing until [my attorney] called me again and told me [there would be] more charges. At [that] point, I was done.

After learning that defendant was a suspect in a murder in another state, Chen went to the hospital where defendant was taken. New Jersey law enforcement officers were already there. Chen gave the cell phone to Lieutenant Gary Allmers of the Bergen County Prosecutor's Office (BCPO) and told Allmers about the suicide note that he had read on defendant's phone. Allmers testified that he was at the hospital attempting to locate defendant as part of the investigation into S.B.'s murder because defendant's phone had "pinged" in the area. Allmers was unaware that defendant had been admitted to the hospital or struck by a train until he arrived. The phone was later examined by an expert in digital forensics after a search warrant and a communications data warrant were obtained.

Dr. Alexander Bardey, a forensic psychiatrist, testified as a defense expert in support of defendant's diminished capacity defense. In evaluating defendant, Bardey reviewed the case file and interviewed defendant and family members. Bardey stated that defendant had a history of depression, borderline personality disorder (BPD), and alcohol abuse, and exhibited "explosive bouts of anger" and impulsive reckless behavior. Bardey believed that defendant's involvement with

13

the World Trade Center terrorist attacks exacerbated his underlying disorders to where they "really started to impair . . . his functioning."

Bardey opined that when defendant killed S.B., he suffered from "acute symptoms of a major depressive disorder and a [BPD]." Bardey explained that BPD is "a personality disorder . . . characterized by . . . [f]rantic efforts to avoid any abandonment," "intense mood swings," "inability to control anger," and "impulsive[,] . . . [risk-]taking behaviors." According to Bardey, BPD is defined by "poor self-image," "repeated bouts of suicidality," "[s]elf-injurious behavior," or "manipulative behaviors." This mental illness caused "cognitive incapacities or impairments in [defendant's] intellectual capacity" during the incident that rendered his acts "impulsive."

To support his opinion, Bardey pointed to defendant's hour-long police interview conducted when he was served with the TRO on October 5, 2015. Bardey stated defendant's "demeanor during th[e] video [was] consistent with [his] diagnosis," where one minute defendant "over[valued]" the victim and the next minute, he "devalue[d]" her. Bardey believed that on the day of the killing, defendant only "planned to go" to S.B.'s home and "scare her" to "have her stop what he perceive[d] to be . . . harassment." Bardey stated that while defendant "knew what he was doing" during the killing, his BPD "prevent[ed] him from

14

having control over what he[] d[id]" or considering consequences "because of [his] overwhelming anger" and "intense emotions." Bardey clarified that he believed defendant "los[t] control of his emotions" when his attorney in the domestic violence matter called and informed him shortly before the killing that he would likely be rearrested. At that moment, "[h]is anger [became] so intense" that he "lost th[e] ability to [deliberate]" and became "disconnected emotionally."

Dr. Steven Simring, also a forensic psychiatrist, testified as the State's expert on rebuttal. Like Bardey, Simring reviewed the discovery and interviewed defendant during his evaluation. Simring diagnosed defendant with "a mixed personality disorder," with "borderline," "narcissistic," and "paranoid" characteristics. Simring described a BPD as a "maladjustment" that does not affect cognition or constitute "a break with reality." He opined that while defendant might not have been "in emotional control," defendant understood what he was doing when he stabbed S.B. and "had a full cognitive ability."

According to Simring, control and cognition are "completely different."

> Cognition is knowing what's happening. At all times, [defendant] knew what was happening. At all times, he knew that this woman was a woman he both hated and loved. At all times, he knew this [was] a woman who was trying to keep him away through

A-2242-19

restraining orders . . . [a]nd at the same time, according to him, provoking him.

He was angry as heck at this woman. He was filled with rage . . . at this woman to the point that he had difficulty controlling his emotion. . . . His temper was out of control . . . .

That's a totally different thing from knowing what's happening. Knowing what's happening is knowing that this is a person that if I stab her, she's going to die, and that it's against the law to stab somebody. . . . [H]e knew it. He just didn't care.

In explaining the basis for his opinion, Simring, like Bardey, relied on defendant's past behavior in romantic relationships, including reports by former partners of physical abuse by defendant. Simring also testified that L.M.'s statement that she "heard someone say I'm sorry I had to do this" just prior to the stabbing suggested that defendant "knew what he did[] and . . . had a reason for it." Additionally, Simring considered defendant's "turbulent" NYPD career and psychological evaluations performed by NYPD and police union mental health professionals.

On February 19, 2019, the jury found defendant guilty on all counts. After denying defendant's motions for a judgment of acquittal notwithstanding the verdict on the hindering charge and for a new trial, R. 3:18-2 and 3:20-1, the

judge imposed sentence, with appropriate mergers, and entered a conforming judgment of conviction on November 15, 2019.[4] This appeal followed.

## II.

We first address defendant's pro se supplemental brief in which he argues the judge erred in admitting the suicide note recovered from the warrantless search of his cell phone and not applying New York law for the search analysis.

At the pre-trial suppression hearing, Chen testified consistent with his trial testimony. Chen stated that when he responded to the train station at about 4:25 p.m. on October 22, 2015, defendant was being extracted from the tracks by emergency personnel and transported to the hospital. After observing defendant bleeding from both legs and screaming "kill me," Chen dispatched an officer to accompany defendant to the hospital. Another officer removed a cell phone from defendant's person and handed it to Chen, who placed it in his pocket. Because defendant was unidentified at that juncture, Chen went to his car and searched the phone, which was unlocked, for contact information.

Chen was able to identify defendant and notify defendant's father and brother about his condition from the contact information he found in the cell

---

[4] The orders denying defendant's motions for a new trial and for judgment of acquittal were issued on December 9, 2019.

phone. After retrieving the contact information from the phone, Chen discovered the "suicide note" in a text message, leading Chen to conclude that defendant had attempted suicide. When Chen later learned that defendant was "connected to a murder in another state," he went to the hospital where defendant had been taken and turned the phone over to a BCPO officer at approximately 9:30 p.m. Chen informed the officer about the suicide note.

Allmers also testified consistent with his trial testimony that he was given defendant's cell phone by Chen at the hospital. Allmers was at the hospital as part of the investigation into S.B.'s murder because defendant's phone had "ping[ed]" in the area. Allmers did not know that defendant had been admitted to the hospital or struck by a train until he spoke to Chen. Chen told Allmers that he had looked through the cell phone to establish defendant's identity. Allmers later secured the phone in an "evidence closet" at the BCPO.

BCPO Captain James McMorrow testified at the suppression hearing but not at the trial. He stated that on October 23, 2015, he approved an affidavit prepared by Detective Matt Zablocki for a warrant to search three cell phones, two of which were defendant's, including the phone Chen had given Allmers. To establish probable cause for the search, among other things, the affidavit recounted: (1) the issuance of a TRO on October 5, 2015, against defendant on

S.B.'s behalf based on defendant entering S.B.'s home while she was sleeping and "threatening her" with "a pair of scissors"; (2) "nude photographs of [S.B.]" sent to S.B.'s employer; (3) "annoying phone calls" to S.B. believed to have come from defendant; (4) L.M.'s conversation with S.B. at the onset of the attack on October 22, 2015, when she overheard a male voice say "I'm sorry I have to do this to you"; and (5) the video from S.B.'s home surveillance system capturing her murder on October 22, 2015. The affidavit also referenced the suicide note that Chen had retrieved from defendant's phone. However, McMorrow testified that even without the suicide note, defendant was the only suspect in S.B.'s homicide. A communications data warrant was later issued by a judge for the phone.

Following the hearing, the judge denied defendant's motion to suppress the suicide-note text retrieved by Chen from defendant's phone. In a written opinion, initially, the judge credited the accounts provided by the testifying witnesses. Next, the judge determined that federal law would govern the disposition of the motion, rather than New Jersey or New York law, because the crime and trial did not take place in New York and Chen was not acting as an agent of New Jersey law enforcement.

The judge explained:

> New Jersey law does not apply in this case due to the absence of agency on the part of the New York officers who acquired the cell phone[]. Certainly, it cannot be said that Chen acted as either an agent of New Jersey or under the color of New Jersey law when he acquired [d]efendant's cell phone. He had no knowledge of the investigation into [the v]ictim's killing and did not cooperate or establish contact with New Jersey authorities until after searching [d]efendant's phone. The court finds that these facts preclude the court from applying New Jersey law to Chen's conduct.

The judge also determined that New York law did not apply because to hold otherwise would "conflate[] the law that governs an officer's conduct with the law that a court applies in resolving a motion to suppress the evidence derived from the officer's conduct." The judge concluded that "[t]he court's rejection of New Jersey and New York law leaves only federal law to govern the court's consideration of [d]efendant's motion to suppress."

Applying federal law, the judge rejected the State's reliance on "the community-caretaking doctrine" and "the emergency-aid exception" to justify Chen's warrantless search of defendant's cell phone. As to the former, the judge found that "Chen's decision to search through [d]efendant's text messages after he had both identified [d]efendant and notified his family members exceeded the scope of a reasonable search under the Fourth Amendment." For similar

20

reasons, the judge determined the State's reliance on the emergency-aid exception was misguided because "the circumstances present at the point Chen searched [d]efendant's phone were not sufficient to provide an objectively reasonable belief that [d]efendant required 'immediate assistance to protect or preserve life, or to prevent serious injury.'" Further, according to the judge, "[t]here was no objectively reasonable nexus . . . between the emergency involving [d]efendant and the location Chen searched." (quoting State v. Edmonds, 211 N.J. 117, 132 (2012)).

However, the judge allowed the State to invoke "the independent-source doctrine" as an "exception to the exclusionary rule to permit its use of the suicide-note text acquired from [d]efendant's phone." The judge found that the State "demonstrated by a preponderance of the evidence" that it "would have sought a warrant" to search defendant's phone independent of the discovery of the text message because the totality of the facts known to the police made defendant "a prime suspect in th[e] case, even without a suspected suicide-note confession." According to the judge, "[o]verwhelming evidence pointed to [d]efendant as the killer." Therefore, the judge concluded that "notwithstanding Chen's unlawful search of [d]efendant's cell phone," the evidence of the suicide-note text message was admissible.

Our standard of review on a suppression motion is well settled. "'When reviewing a trial court's decision to grant or deny a suppression motion, appellate courts "[ordinarily] defer to the factual findings of the trial court so long as those findings are supported by sufficient evidence in the record."'" State v. Smart, 253 N.J. 156, 164 (2023) (alteration in original) (quoting State v. Dunbar, 229 N.J. 521, 538 (2017)). "We defer to those findings of fact because they 'are substantially influenced by [an] opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy.'" State v. Hubbard, 222 N.J. 249, 262 (2015) (alteration in original) (quoting State v. Johnson, 42 N.J. 146, 161 (1964)). As such, "[w]e will set aside a trial court's findings of fact only when such findings 'are clearly mistaken.'" Dunbar, 229 N.J. at 538 (quoting Hubbard, 222 N.J. at 262). "We accord no deference, however, to a trial court's interpretation of law, which we review de novo." Ibid.

Turning to the substantive legal principles, both the Fourth Amendment of the United States Constitution and Article I, paragraph 7 of the New Jersey Constitution protect citizens against unreasonable searches and seizures. Edmonds, 211 N.J. at 129. A search conducted without a warrant is presumptively invalid, and the State must demonstrate by a preponderance of

the evidence that the search falls within one of the well-recognized exceptions to the warrant requirement to overcome the presumption of invalidity. See Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973); State v. Manning, 240 N.J. 308, 329 (2020). These constitutional protections extend to searches of data on cell phones. Riley v. California, 573 U.S. 373, 403 (2014).

Under the exclusionary rule, evidence obtained unconstitutionally is inadmissible in court. Mapp v. Ohio, 367 U.S. 643, 654-55 (1961). "Ordinarily, this state's exclusionary rule will not be invoked to bar otherwise reliable and relevant evidence gathered by law enforcement officers of another jurisdiction over which our state has no control or authority, when those officers act in conformity with the Federal Constitution." State v. Evers, 175 N.J. 355, 376 (2003). Applying the exclusionary rule in these circumstances "would advance none of its purposes—deterrence, judicial integrity, and imposing a cost on illicit behavior—and would disserve the process of doing justice in this state by preventing the introduction of reliable and relevant evidence in a criminal prosecution." Id. at 380.

"The securing of evidence in violation of the Fourth Amendment in another state would require New Jersey, pursuant to the Supremacy Clause, to apply the exclusionary rule as though the evidence had been wrongfully obtained

here." Id. at 378 (citing U.S. Const. art. VI, cl. 2). Our Supreme Court has declined to apply our State's more restrictive constitutional standards to federal law enforcement agents "provided that their conduct is pursuant to federal authority and consistent with applicable federal law, and provided further they have acted independently and without the cooperation or assistance of our own state officers with respect to the seizure of such evidence." State v. Mollica, 114 N.J. 329, 358 (1989).

Applying these principles, Chen was acting independently from New Jersey law enforcement officers when he searched defendant's phone for contact information to identify defendant and notify relatives. After obtaining the contact information, Chen discovered the suicide note on the phone. At the time, Chen was unaware of S.B.'s murder, and New Jersey law enforcement officers had not yet engaged with New York officers. Indeed, Allmers went to the hospital because he was tracking defendant's phone. There, Allmers spoke with Chen for the first time and learned about the suicide note. The phone was secured until a New Jersey communications data warrant was obtained.

We agree with the judge that because Chen, a New York officer, was acting entirely independently of New Jersey law enforcement officers, federal law governs. We also agree that Chen's warrantless search is not justifiable

under either the emergency-aid or community-caretaking doctrine.  Both doctrines fall under the umbrella of the exigent circumstances exception. Edmonds, 211 N.J. at 130, 141.  For a warrantless search to be justified by the emergency-aid doctrine under federal law, the search must satisfy "a two-pronged test that asks whether:  (1) considering the totality of the circumstances, law enforcement had an objectively reasonable basis for concluding that there was an immediate need to protect others or themselves from serious harm; and (2) the search's scope and manner were reasonable to meet the need."  United States v. Snipe, 515 F.3d 947, 952 (9th Cir. 2008); see Michigan v. Fisher, 558 U.S. 45, 47 (2009) ("This 'emergency aid exception' does not depend on the officers' subjective intent or the seriousness of any crime they are investigating when the emergency arises.").

The related community-caretaking doctrine is a narrow exception that allows law enforcement to conduct a warrantless search "to protect or preserve life or avoid serious injury."  Brigham City v. Stuart, 547 U.S. 398, 403 (2006) (quoting Mincey v. Arizona, 437 U.S. 385, 392 (1978)).  Such searches are constitutional where the officer's community-caretaking functions are "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute," Cady v. Dombrowski, 413 U.S. 433, 441

(1973), and the officer's conduct was objectively reasonable under the circumstances, Brigham, 547 U.S. at 404.

When Chen viewed the suicide note, defendant was already being treated for his injuries, obviating any immediate need to preserve life or avoid serious injury. Because Chen viewed the note after he had obtained defendant's contact information, notified his relatives, and ensured that defendant was receiving needed medical treatment, we agree with the judge that neither exception allowed the warrantless search of defendant's phone. As a result, the search was unconstitutional.

Nevertheless, we agree that the independent source exception to the exclusionary rule applies. Because a state court must always enforce federal constitutional rights pursuant to the Supremacy Clause, U.S. Const. art. VI, cl. 2, it follows that it would also apply federal exceptions to the exclusionary rule when only federal rights are violated. "The independent source doctrine allows admission of evidence that has been discovered by means wholly independent of any constitutional violation." Nix v. Williams, 467 U.S. 431, 443 (1984).

> The independent source doctrine teaches us that the interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a worse, position that

26

they would have been in if no police error or misconduct had occurred.

[Ibid. (emphasis omitted).]

For the doctrine to apply, the State must demonstrate that (1) "there was probable cause for the [search] warrant to be issued" without the unlawfully obtained information; and (2) "police would have applied for the search warrant" regardless. United States v. Herrold, 962 F.2d 1131, 1140 (3d Cir. 1992).[5]

Here, there was overwhelming evidence to establish probable cause implicating defendant in the murder for the issuance of a search warrant without the suicide note. See State v. Johnson, 171 N.J. 192, 214 (2002) (defining probable cause as "nothing more than 'a practical, common-sense decision whether, given all the circumstances . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." (omission

---

[5]  The independent source test under the New Jersey Constitution is more exacting. It requires the State to prove a third prong, "that the initial impermissible search was not the product of flagrant police misconduct." State v. Holland, 176 N.J. 344, 361 (2003). The State must also prove the second and third prongs by clear and convincing evidence. Ibid. Like the trial court, we apply federal law but note that the text message would also be admissible under the New Jersey test. Pertinent to the third prong, the judge determined that Chen was acting in good faith and in a community-caretaking capacity when he searched the phone. See State v. Camey, 239 N.J. 282, 310 (2019) ("Flagrancy is a high bar, requiring active disregard of proper procedure, or overt attempts to undermine constitutional protections.").

27

in original) (quoting State v. Demeter, 124 N.J. 374, 380-81 (1991))). Further, the State would have applied for a search warrant regardless, as they ultimately did. As McMorrow testified, it was standard to seek communications data from a murder suspect's phone. Accordingly, we affirm the judge's ruling denying defendant's suppression motion.

## III.

Turning to defendant's counseled brief, in Point I, he argues for the first time on appeal that "Simring's testimony that [defendant] 'knew' what he was doing when he killed [S.B.] . . . usurped the jury's exclusive role" in deciding "the ultimate culpability issue." Defendant asserts that because the State had to prove that he "knowingly" or "purposely" committed the respective offenses, particularly causing S.B.'s death or serious bodily injury resulting in death, see N.J.S.A. 2C:11-3(a)(1) to (2), Simring's testimony tainted the verdict.

Where a party does not object to challenged testimony, we review for plain error and determine if the alleged error is "clearly capable of producing an unjust result." State v. Montalvo, 229 N.J. 300, 320-21 (2017) (quoting R. 2:10-2). "'The possibility of an unjust result must be "sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have

reached."'" State v. C.W.H., 465 N.J. Super. 574, 594-95 (App. Div. 2021) (quoting State v. Ross, 229 N.J. 389, 407 (2017)).

To support his argument, defendant points to six separate instances in Simring's testimony where he commented on defendant's mental state. These instances include Simring's testimony that defendant's statement, "I'm sorry I have to do this," when he stabbed S.B., "suggest[ed that] he knew what he did, and he had a reason for it." In addition, Simring testified that defendant's purchase of a knife three days before the stabbing

> inform[ed his] diagnosis that [defendant] understood what he was doing. He . . . knew that when he got the knife, he knew it was a knife. He researched how you have [to] use the knife, how far you have to use the knife to cut into a person to cause death, [and] he knew it was a knife. He knew he had a purpose for this. He . . . knew . . . it was a knife[,] and he had a plan . . . .

Later in his testimony, Simring stated that defendant "knew exactly what he was doing" but was "so mad" that he "didn't care." In discussing cognition, Simring stated, "[c]ognition is knowing what's happening." Simring confirmed that "[a]t all times, [defendant] knew what was happening" but "just didn't care." Simring added that defendant "had no cognitive disability. He knew exactly what was happening . . . for the three and a half hours leading up to the stabbing and during the time of the stabbing and for the one hour following the stabbing[.]

[H]e had . . . full cognitive ability." According to Simring, defendant's "behavior signifie[d]" that "he may very well have been in a rage," but "he certainly knew what he was doing." Defendant acknowledges that Simring's testimony that "mental disease did not affect [defendant's] cognitive capacity was proper," but asserts that it "should have ended there."

Under N.J.R.E. 704, expert testimony "is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." However, where the ultimate-issue testimony by an expert is "tantamount to a legal conclusion," it "usurp[s] the jury's singular role in the determination of [a] defendant's guilt and irredeemably taint[s] the remaining trial poofs." State v. Reeds, 197 N.J. 280, 297, 300 (2009). As such, expert witnesses should "avoid use of precise terminology found in the [charged] statute," State v. Cain, 224 N.J. 410, 424 (2016) (quoting State v. Nesbitt, 185 N.J. 504, 508 (2006)), and are forbidden from expressing "a direct opinion on the defendant's guilt or innocence" or providing an "opinion 'in such a way as to emphasize that the expert believes the defendant is guilty of the crime charged under the statute,'" State v. Papasavvas, 163 N.J. 565, 612 (quoting State v. Odom, 116 N.J. 65, 80 (1989)), opinion corrected, 164 N.J. 553 (2000). Indeed, "[e]xpert testimony that recites

the legal conclusion sought in a verdict is not helpful to the jury." Nesbitt, 185 N.J. at 517.

In addition, at least in drug distribution cases, the New Jersey Supreme Court has held that "an expert's opinion on the defendant's state of mind . . . encroaches on the exclusive domain of the jury as trier of fact." State v. Simms, 224 N.J. 393, 396 (2016). "In drug cases, such ultimate-issue testimony may be viewed as an expert's quasi-pronouncement of guilt that intrudes on the exclusive domain of the jury . . . ." Cain, 224 N.J. at 427. However, Simms and Cain clearly cabin the applicability of their holdings to drug cases. See Simms, 224 N.J. at 409 ("When the ultimate issue of fact in a drug case is the defendant's state of mind . . . , expert testimony is not permissible."); Cain, 224 N.J. at 429 ("Going forward, in drug cases, an expert witness may not opine on the defendant's state of mind.").

Where, as here, a defendant's mental state during the commission of a non-drug crime is at issue, expert opinion testimony on whether a defendant knew what he or she was doing is pertinent and permitted. See, e.g., Papasavvas, 163 N.J. at 611-14 (finding permissible expert testimony that the defendant "knew exactly what he was doing" and was "goal-directed and purpose-directed"); State v. Nataluk, 316 N.J. Super. 336, 346-47 (App. Div. 1998) (finding no issue with

31

expert's testimony that the defendant "was neither aware of what he was doing . . . nor . . . able to comprehend [his] behavior or its consequences"). "Courts have generally agreed that the admission of psychiatric testimony on the issue of mental state is an evidentiary question that should not be unduly restricted." State v. Galloway, 133 N.J. 631, 649 (1993).

Defendant invoked diminished capacity as his defense in this case. Diminished capacity is established where the defendant "suffer[s] from a mental disease or defect that would negate the knowing or purposeful state of mind required to be [found] liable for . . . knowing or purposeful murder." State v. Rivera, 205 N.J. 472, 475 (2011); see also N.J.S.A. 2C:4-2; N.J.S.A. 2C:11-3(a)(1) to (2). "[D]iminished capacity refers to evidence that can negate the presence of an essential mental element of the crime (as when, for example, a learning-disabled person strikes another but is unable to know that the blow could kill)." State v. Delibero, 149 N.J. 90, 98 (1997). "A jury considers evidence of diminished capacity in relation to the State's burden to prove the essential elements of the crime." Ibid.

Diminished capacity covers "a broad range of mental conditions," including BPD. Galloway, 133 N.J. at 641. As stated by our Supreme Court:

> [A]ll mental deficiencies, including conditions that
> cause a loss of emotional control, may satisfy the

diminished-capacity defense if the record shows that experts in the psychological field believe that that kind of mental deficiency can affect a person's cognitive faculties, and the record contains evidence that the claimed deficiency did affect the defendant's cognitive capacity to form the mental state necessary for the commission of the crime.

[Id. at 647.]

In State v. J.T., 455 N.J. Super. 176, 181 (App. Div. 2018), the defendant "admitted she suffocated her husband [with a plastic bag] and then attempted to suffocate her children." The central issue "was whether defendant was legally insane at the time she engaged in this conduct." Ibid. "The jury found defendant was legally sane and therefore criminally culpable." Ibid.

Defendant had lived a conventional, law[-]abiding life until the day she suffocated her husband[] and attempted to kill herself and her two children. The evidence presented to the jury at trial showed this aberrational behavior by defendant was preceded by a stroke suffered by her then fifty-year-old husband[, M.T.,] that left him paralyzed and completely dependent on defendant for all of his needs. M.T.'s devastating health crisis also had catastrophic financial consequences on the family. Defendant was the only income-producing person; M.T.'s immediate and long-term needs were not covered by insurance or Medicaid. A number of witnesses at trial described defendant's behavior on the days leading to her husband's discharge from the rehabilitation facility as obsessively preoccupied with the numerous problems, both practical and financial, associated with M.T.'s homecare.

33

[Id. at 215-16.]

Simring, the State's expert in J.T. as well, disagreed with the defense expert that the defendant was "clinically delusional and depressed when she killed her husband." Id. at 212. In his direct testimony, Simring testified,

> [Defendant] does not meet any of the prongs of the insanity defense. She does not have a significant mental illness. She was certainly upset and overwhelmed, but that's not [an] illness. She knew the nature of the act. That this was a bag. She knew what a bag could do. In fact, that was her specific intent. And she knew that what she was doing was wrong, even if she at that point thought she had good justification.

[Id. at 213 (emphasis added).]

In reversing her convictions, we held that Simring's testimony constituted plain error because it constituted "ultimate-issue testimony," the ultimate issue being whether the defendant was "mentally capable of distinguishing right from wrong" when she committed the crimes. Id. at 215-16. We reasoned that by "explain[ing] to the jury the concept of 'legal insanity' and then . . . opin[ing] on whether defendant's conduct satisfied the elements of this affirmative defense," "Simring's testimony usurped the jury's exclusive role to determine whether defendant satisfied her burden of proof." Ibid.

Here, although Simring testified defendant knew what he was doing and had no cognitive disability, the case is distinguishable from J.T. because Simring

34

did not state that defendant did not meet the criteria for the diminished capacity defense. Simring did not define legal terms for the jury, express his opinions as legal conclusions, or state that defendant was guilty of the crimes. While we acknowledge that Simring used the words "knowing" and "knew," he did so within the confines of his psychiatric expertise to explain to the jury defendant's ability to comprehend the nature of his actions.

"[A]s long as the expert does not express [an] opinion of defendant's guilt but simply characterizes defendant's conduct based on the facts in evidence in light of [the expert's] specialized knowledge, the opinion is not objectionable even though it embraces ultimate issues that the jury must decide." Papasavvas, 163 N.J. at 612-13 (quoting Odom, 116 N.J. at 79). Moreover, the judge repeatedly instructed the jurors that they were the sole arbiters of defendant's guilt and were not bound by any expert opinion. "One of the foundations of our jury system is that the jury is presumed to follow the trial court's instructions." State v. Burns, 192 N.J. 312, 335 (2007). Accordingly, we discern no plain error in Simring's testimony.

IV.

In a related argument, in Point IV, defendant asserts the judge should have granted a mistrial because the prosecuting attorney "crossed the line into

35

improper ultimate issue questions by using the legal term 'knowingly' and a prior

report" in cross-examining the defense expert.

> A mistrial should only be granted "to prevent an obvious failure of justice." State v. Harvey, 151 N.J. 117, 205 (1997). Whether an event at trial justifies a mistrial is a decision "entrusted to the sound discretion of the trial court." Ibid. (citing State v. DiRienzo, 53 N.J. 360, 383 (1969)). Appellate courts "will not disturb a trial court's ruling on a motion for a mistrial, absent an abuse of discretion that results in a manifest injustice." State v. Jackson, 211 N.J. 394, 407 (2012) (quoting Harvey, 151 N.J. at 205).
>
> [State v. Smith, 224 N.J. 36, 47 (2016) (citations reformatted).]

"If there is 'an appropriate alternative course of action,'" such as a curative

instruction, "a mistrial is not a proper exercise of discretion." Ibid. (quoting

State v. Allah, 170 N.J. 269, 281 (2002)). Whether an instruction is sufficient

is dependent on the error's nature and prejudicial effect as well as the

instruction's timing and substance. State v. Herbert, 457 N.J. Super. 490, 505-07

(App. Div. 2019). "[A] swift and firm instruction is better than a delayed one."

Id. at 505-06. Consequently, the "'better practice'" is "to give limiting

instructions at the time the evidence is presented and again in the final jury

charge." Id. at 506 (quoting State v. Blakney, 189 N.J. 88, 93 (2006)). "As for

36

substance, a specific and explanatory instruction is often more effective than a general, conclusory one." Ibid.

Applying these principles, we discern no abuse of discretion in the judge's denial of defendant's motion for a mistrial. By way of background, during his direct examination, in contrast to Simring's testimony, Bardey testified that defendant's mental illness resulted in "cognitive incapacities or impairments in his intellectual capacity" at the time he caused S.B.'s death. On cross-examination, after Bardey acknowledged defendant "knew what he was doing," the prosecutor questioned Bardey about a statement in his report that defendant "acted knowingly in that he was aware his behavior [would] likely cause death or serious bodily injury resulting in death."

Bardey responded, "[defendant] knew what he was doing. Absolutely." However, Bardey added:

> Knowing what he was doing is an aspect of the insanity defense. In other words, if he did not know what he was doing because of some psychotic symptom, then he would not be criminally responsible.
>
> Here I'm talking about a diagnosis of [BPD] which prevents him from having control over what he's doing. He knows what he's doing. He just can't control himself because of the overwhelming anger.

Subsequently, the prosecutor asked Bardey about a statement in another one of Bardey's reports, specifically, that defendant's "behavior was driven by extreme disturbance rather than being the product of knowing and intentional behavior." The prosecutor then asked Bardey to explain the apparent conflict between the two reports. Defense counsel objected and the judge sustained the objection, stating, "we're getting into legal definition." Relying on J.T., defendant moved for a mistrial, arguing that the State's questioning impermissibly addressed the ultimate issue in the case.

The judge denied the motion and gave the jury the following curative instruction:

> You heard testimony from . . . Bardey that the State contends is inconsistent with a prior opinion that . . . Bardey provided. Any testimony you heard as to . . . defendant acting knowingly can only be considered for the purpose of . . . Bardey's credibility as an expert witness, not for [defendant's] state of mind at the time of the death of [S.B.].
>
> Whether [defendant] acted knowingly is a conclusion only you can reach[] after considering all of the evidence[] and my instructions to you.

The objection was made during Bardey's cross-examination in the afternoon session on Thursday, February 7, 2019. Shortly thereafter, the judge recessed court proceedings and excused the jury for the day. The curative

instruction was given the following court day, on February 11, 2019, while Bardey was still testifying. The instruction was provided before Bardey's redirect examination wherein he was allowed to clarify his testimony regarding defendant's state of mind and loss of control on the day of the murder.

We are satisfied the judge correctly determined that the State's objectionable cross-examination could be remedied by a curative instruction. The prosecutor's reference to Bardey's report that defendant "acted knowingly in that he was aware his behavior [would] likely cause death or serious bodily injury resulting in death" impermissibly used the precise terminology found in N.J.S.A. 2C:11-3(a). Given the error's nature as well as the instruction's timing and content, there was little risk that the prejudicial effect of the testimony had "become cemented into a storyline the jurors create[d] in their minds during the course of the trial." Herbert, 457 N.J. Super. at 506. Furthermore, the instruction "explain[ed] precisely the permitted and prohibited purposes of the evidence." Ibid. (quoting State v. Fortin, 162 N.J. 517, 534 (2000)). Thus, we are convinced that denying defendant's motion for a mistrial and issuing a prompt, specific, and effective curative instruction did not result in a manifest injustice.

A-2242-19

V.

In Point VI, defendant contends that the judge abused her discretion by denying his motion for a mistrial because the limiting instruction that hearsay statements relied upon by an expert are not to be considered substantively came "hours" after Simring read "lengthy portions of witness statements into the record."

Under N.J.R.E. 703:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the proceeding. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

See State v. Eatman, 340 N.J. Super. 295, 302 (App. Div. 2001) ("An expert is permitted to rely on hearsay information in forming [an] opinion concerning the defendant's mental state.").

Still, "the expert's opinion should not provide 'an independent basis for the admission of otherwise inadmissible hearsay.'" State v. Torres, 183 N.J. 554, 575-76 (2005) (quoting Biunno, Current N.J. Rules of Evidence, cmt. 7 on N.J.R.E. 703 (2003)). Rather, "an expert may offer out-of-court statements of others to support the opinions presented." Id. at 576. Such testimony is subject

40

to a limiting instruction that the statements should not be considered as substantive evidence of guilt, but only as evidence to support the expert's conclusions. State v. King, 387 N.J. Super. 522, 549 (App. Div. 2006). Stated differently, the jury should understand "its absolute prerogative to reject both the expert's opinion and the version of the facts consistent with that opinion." Torres, 183 N.J. at 580 (quoting State v. Berry, 140 N.J. 280, 304 (1995)).

Here, in explaining the basis of his opinion, Simring relied on defendant's past behavior in romantic relationships, as did Bardey. Simring also recounted a psychological evaluation of defendant performed by NYPD and police union mental health professionals. Defendant objected and moved for a mistrial because Simring was reading from the reports and documents after being repeatedly warned not to do so.[6] The judge denied the mistrial motion, admonished Simring to only refer to the reports to refresh his recollection, and gave the jury a limiting instruction regarding the statements and documents relied on by the experts.

The judge instructed the jury as follows:

> I want to give you a limiting instruction again. You've heard it from me already several times, but I'm going to broaden it a little bit.

---

[6] Simring also read from L.M.'s statement, but L.M. had already testified about her involvement in the case consistent with her prior statement.

Both in . . . Bardey's testimony and . . . Simring's testimony, you heard that they relied on a lot of documentation, reports, witness statements, things of that nature. You should not consider any of the materials that they relied on as substantive evidence relating to the question of guilt or innocence of the accused, but only as evidence tending to support the doctors' opinions related to defendant's diagnosis and mental state.

In other words, the doctors . . . may rely on defendant's statements in forming their opinions, and you may consider the opinions as evidence. But you may not consider . . . defendant's statement or any of the other statements relied upon by the experts [or] conveyed to the experts as establishing facts in this case separate from the doctors' opinions.

Moreover, to the extent that the doctors' opinions hinge on the truth of the matter asserted, either in defendant's statement[s] or any of the other documentation relied upon by the doctors, by the experts, including any witness statements or witness testimony, the probative value of the opinion is dependent upon and no stronger than any independent proof of the statements made by . . . defendant or any of the other witnesses or people relied upon by the doctors. So that's an important instruction. You'll be hearing that again at the end of the case.

The judge reiterated a version of the instruction during the final jury charge.

We are satisfied the judge's decision to deny the motion for a mistrial and issue the limiting instruction did not constitute an abuse of discretion. See Herbert, 457 N.J. Super. at 503 ("The same deferential standard that applies to

the mistrial-or-no-mistrial decision applies to review of the curative instruction itself."). Defendant does not argue that the instruction was improper but rather that it was not given in a timely manner. See State v. Winter, 96 N.J. 640, 648-49 (1984) (noting the importance of an immediate and firm instruction). The instruction was given in the middle of Simring's testimony. Although the timing may not have been optimal, the instruction was thorough and effective. Moreover, we "must rely upon the jurors' ability and willingness to follow the limiting instruction[s]." State v. Manley, 54 N.J. 259, 270 (1969).

VI.

In Point III, defendant argues he was deprived of a fair trial because of prosecutorial misconduct. He asserts the prosecutor's comment on emotion during summation was improper as it was "a misstatement of law." He contends the judge's curative instruction was insufficient as it "did not instruct the jury to disregard the prosecutor's statement."

Because "prosecutors in criminal cases are expected to make vigorous and forceful closing arguments to juries," they are "afforded considerable leeway in closing arguments." State v. McNeil-Thomas, 238 N.J. 256, 275 (2019) (quoting State v. Frost, 158 N.J. 76, 82 (1999)). However, they "should not make inaccurate legal or factual assertions" and "must confine their comments to

43

evidence revealed during the trial and reasonable inferences to be drawn from that evidence." State v. Smith, 167 N.J. 158, 177-78 (2001).

Nonetheless,

> even when a prosecutor's remarks stray over the line of permissible commentary, our inquiry does not end. Rather, we weigh "the severity of the misconduct and its prejudicial effect on the defendant's right to a fair trial," and we reverse a conviction on the basis of prosecutorial misconduct only if "the conduct was so egregious as to deprive [the] defendant of a fair trial."
>
> [McNeil-Thomas, 238 N.J. at 275 (quoting State v. Wakefield, 190 N.J. 397, 437 (2007)).]

Stated differently, we will not reverse a conviction based on prosecutorial misconduct during the State's summation unless it "substantially prejudice[d] the defendant's fundamental right to have the jury fairly evaluate the merits of [the] defense." State v. Garcia, 245 N.J. 412, 436 (2021) (quoting State v. Bucanis, 26 N.J. 45, 56 (1958)).

In making that determination, we "must take into account the tenor of the trial and the degree of responsiveness of both counsel and the court to improprieties when they occurred." State v. Williams, 244 N.J. 592, 608 (2021) (quoting Frost, 158 N.J. at 83). "Factors to be considered in making that decision include, '(1) whether defense counsel made timely and proper objections to the improper remarks; (2) whether the remarks were withdrawn

promptly; and (3) whether the court ordered the remarks stricken from the record and instructed the jury to disregard them.'" Ibid. (quoting Frost, 158 N.J. at 83).

Here, during summation, the prosecutor told the jury:

> Nowhere in the law that the [j]udge will instruct you on[] is there any indication of any emotion for you to consider. Emotion does not factor into it. There's nothing at all about emotion in that [c]harge. It is all about cognition, knowing, purposeful intent.
>
>    . . . .
>
>    . . . Barde[y] said that defendant knew what he was doing but he lost all control. Again, like I told you, nowhere in the charge that the [j]udge gives you will there be anything about emotion . . . in that charge. It's all knowledge, purposeful, cognitive ability, capability, intent. Nothing about anything of an emotional aspect that . . . Barde[y] was trying to tell you with regard to his first report.

After the summation, defense counsel objected to the prosecutor's statement that the jury charge "says nothing about emotional control." Counsel argued the reference was a "misrepresentation of the law." As a remedy, counsel urged the judge to modify the model jury charge on diminished capacity to include "emotion" as countenanced in Galloway, 133 N.J. at 647.

The judge responded:

> I did consider defense counsel's request . . . to modify the [m]odel [j]ury [c]harge with respect to diminished capacity. I'm not going to do that. But I am going to

45

instruct the [j]ury in connection with the [p]rosecutor's statement to them that the word emotion does not appear anywhere in the diminished capacity charge. . . . And I don't mean to say that the [p]rosecutor was trying to be misleading because she was not.

[Her] presentation was made in good faith, an excellent presentation. But it lea[ves] the [j]ury with the impression that they're not permitted to consider . . . defendant's emotions in connection with the diminished capacity charge . . . [m]erely because the word emotion is not used in the charge, and that is misleading with respect to the state of the law.

As a result, prior to giving the final charge, the judge instructed the jury as follows:

Before I get into reading the [final] instructions, I want to give you one instruction concerning [the] summations you just heard. You heard during the [p]rosecutor's [s]ummation that the word emotion does not appear anywhere in the diminished capacity charge. You are to consider all the evidence presented at trial, and may consider testimony concerning . . . defendant's emotions, as it impacts the diminished capacity charge. Based upon all of the evidence presented, you are to come to a fair and impartial verdict.

While delivering the final charge, the judge stressed:

You must accept and apply this law for this case as I give it to you in this [c]harge. Any ideas you have of what the law is or what the law should be, or any statements by the attorneys as to what the law may be must be disregarded by you, if they're in conflict with my [c]harge.

[(Emphasis added).]

We agree with the judge that the prosecutor's statement left the jury with a misimpression of the law concerning diminished capacity. Our Supreme Court has made clear that "all mental deficiencies, including conditions that cause a loss of emotional control, may satisfy the diminished-capacity defense if the record shows that experts in the psychological field believe that that kind of mental deficiency can affect a person's cognitive faculties." Galloway, 133 N.J. at 647. The prosecutor's statement that "[e]motion [did] not factor into" the diminished capacity jury charge suggested otherwise by implying to the jury that it could not consider emotion in determining defendant's cognitive capacity.

Defendant timely objected to the prosecutor's comment. Although the judge did not order the remarks stricken from the record, she gave a curative instruction repudiating the comment. The instruction specifically identified the offending comment and explicitly corrected the prosecutor's misstatement. "A curative jury instruction is one method to remedy trial error, and is sometimes required . . . to address erroneous statements by attorneys in their closing arguments[.]" State v. McKinney, 223 N.J. 475, 497 (2015). "In those contexts, the decision to provide a curative instruction and the content of that statement

is left to the discretion of the trial judge."  Ibid. (citing State v. Yough, 208 N.J. 385, 397 (2011)).

Under the circumstances, we discern no abuse of discretion in the judge's decision to provide a curative instruction or in the content of the instruction, and we are satisfied that the prosecutor's conduct was not so egregious as to deprive defendant of a fair trial.  See State v. Hipplewith, 33 N.J. 300, 315 (1960) (explaining that, had counsel misstated the law, the court's jury instruction to follow its statement of the law and disregard counsel's statements would have adequately protected defendant's right to a fair trial).

## VII.

Relatedly, in Point II, defendant asserts that the error resulting from the prosecutor's misstatement of the law "was compounded" by the judge's refusal to tailor the diminished capacity model jury charge to add language as set forth in Galloway, 133 N.J. at 647, that "mental deficiencies, 'including conditions that cause a loss of emotional control,'" may satisfy the diminished capacity defense.  According to defendant, the judge's "failure to instruct the jury in accordance with Galloway deprived [him] of a fair trial."

Our jurisprudence governing appropriate jury charges is well settled.

"Appropriate and proper charges to a jury are essential for a fair trial."  State v. Green, 86 N.J. 281,

287 (1981). The court must "explain the controlling legal principles and the questions the jury is to decide." State v. Martin, 119 N.J. 2, 15 (1990). Instructions demand careful attention and "must provide a comprehensible explanation of the questions that the jury must determine, including the law of the case applicable to the facts that the jury may find." Montalvo, 229 N.J. at 320 (citations and internal quotation marks omitted). Proper instruction is so critical that "erroneous instructions on material points are presumed to be reversible error." Martin, 119 N.J. at 15. Adequate charges are particularly important where the State and the defendant offer contrasting theories of causation. Ibid.

[State v. Lora, 465 N.J. Super. 477, 501 (App. Div. 2020) (citations reformatted).]

In evaluating a jury charge, we "must not look at portions of the charge alleged to be erroneous in isolation; rather, 'the charge should be examined as a whole to determine its overall effect,' and 'whether the challenged language was misleading or ambiguous.'" McKinney, 223 N.J. at 494 (citation omitted) (internal quotation marks omitted) (first quoting State v. Jordan, 147 N.J. 409, 422 (1997); and then quoting State v. Nelson, 173 N.J. 417, 447 (2002)). Generally, an instruction should be "tailored" or "molded" to the facts adduced at trial if "the statement of relevant law, when divorced from the facts, [i]s potentially confusing or misleading to the jury." State v. Robinson, 165 N.J. 32, 42 (2000). But where the facts of the case and the claims of the parties are clear,

A-2242-19

the court is not so obliged, <u>State v. Angoy</u>, 329 N.J. Super. 79, 85 (App. Div. 2000), and "[n]o party is entitled to have the jury charged in [that party's] own words; all that is necessary is that the charge as a whole be accurate," <u>Jordan</u>, 147 N.J. at 422.

In the final charge to the jury, the judge instructed the jury on diminished capacity as follows:

> In considering the State's burden of proof which is to prove every element of the charged offenses beyond a reasonable doubt you must consider and weigh all of the evidence of defendant's mental state, including that offered as evidence of mental disease or defect, i.e.[,] [PTSD], [BPD], and major depressive disorder, in determining whether or not the State has proven beyond a reasonable doubt that defendant acted purposely, knowingly, [or] recklessly, which are elements of murder, aggravated manslaughter, [and] reckless manslaughter . . . .
>
> In making this decision, you must give . . . defendant the benefit of any reasonable doubt about whether his mental functioning was such as to render him incapable of acting with the required state of mind, or about whether he did in fact act with the required state of mind. In other words, you must determine whether despite the evidence of mental disease or defect the State has proven beyond a reasonable doubt that . . . defendant acted with the [required] state of mind whether that be purposely, knowingly, or recklessly.
>
> If after considering all of the evidence, including the evidence of mental disease or defect, i.e.[,] [PTSD],

[BPD], and major depressive disorder, or any other evidence or lack of evidence in the case, you have a reasonable doubt whether . . . defendant's mental functioning was such as to render [him] incapable of acting with the required state of mind[, o]r if you have a reasonable doubt whether he did in fact act with a required state of mind, then . . . defendant is not guilty of the crimes I've already referred to. If however you find that the State has proven beyond a reasonable doubt that defendant was able to, and did in fact [act] purposely, knowingly, or recklessly together with all the other elements of the offense beyond a reasonable doubt, then you must find . . . defendant guilty.

The charge given by the judge essentially tracked the Model Jury Charges (Criminal), "Evidence of Mental Disease or Defect (N.J.S.A. 2C:4-2)" (rev. June 5, 2006). Although model jury charges "are not binding authority," State v. Bryant, 419 N.J. Super. 15, 28 (App. Div. 2011), "a jury charge is presumed to be proper when it tracks the model jury charge because the process to adopt model jury charges is 'comprehensive and thorough,'" State v. Cotto, 471 N.J. Super. 489, 543 (App. Div. 2022) (quoting State v. R.B., 183 N.J. 308, 325 (2005)); see R.B., 183 N.J. at 325 (instructing trial courts to follow the model jury charges and read them "in their entirety to the jury"); State v. Whitaker, 402 N.J. Super. 495, 513-14 (App. Div. 2008) ("When a jury instruction follows the model jury charge, although not determinative, 'it is a persuasive argument in favor of the charge as delivered.'" (quoting Angoy, 329 N.J. Super. at 84)).

Defendant relies on <u>Galloway</u>, where the Court held that a jury instruction on diminished capacity is warranted "when [a] defendant has presented evidence of a mental disease or defect that interferes with cognitive ability sufficient to prevent or interfere with the formation of the requisite intent or mens rea," including "conditions that cause a loss of emotional control." 133 N.J. at 647 (italicization omitted). However, <u>Galloway</u> did not require that the words "emotion" or "emotional control" be used in a diminished capacity charge, only that the charge be given.

Here, we are satisfied that no facts adduced at trial required the judge to modify the model jury charge as requested by defendant. Although the model charge cites <u>Galloway</u>'s holding in a footnote, it does not incorporate the words "emotion" or "emotional control" in the text of the charge. <u>See</u> <u>Model Jury Charges (Criminal)</u>, "Evidence of Mental Disease or Defect (N.J.S.A. 2C:4-2)" (rev. June 5, 2006). We are convinced that the diminished capacity instruction provided by the judge in the final charge, in conjunction with the curative instruction following the prosecutor's summation, made the jury aware that it could consider defendant's loss of emotional control, as urged by Bardey, as part of its evaluation of the diminished capacity defense. We therefore discern no error in the jury charge as a whole.

52

## VIII.

In Point V, defendant argues the judge erred in denying his motion for a new trial pursuant to Rule 3:20-1 based on the arguments he raised in Points I, II, III, and IV of his counseled brief concerning "ultimate-issue" testimony, prosecutorial misconduct, and tailoring the model jury charge. For the reasons already stated, these arguments are unavailing.

Rule 3:20-1 "provide[s] a mechanism for seeking a new trial following a criminal conviction." State v. Armour, 446 N.J. Super. 295, 305 (App. Div. 2016). "[A] motion for a new trial is addressed to the sound discretion of the trial judge, and the exercise of that discretion will not be interfered with on appeal unless a clear abuse has been shown." Id. at 306 (alteration in original) (quoting State v. Russo, 333 N.J. Super. 119, 137 (App. Div. 2000)). Stated differently, "[a] trial court's ruling on a motion for a new trial 'shall not be reversed unless it clearly appears that there was a miscarriage of justice under the law.'" Id. at 305 (quoting R. 2:10-1).

Because there were no errors warranting a new trial, the denial of defendant's motion was neither an abuse of discretion nor a miscarriage of justice under the law.

IX.

In Point VII, defendant asserts his sentence is excessive. He argues the judge "did not accurately apply the sentencing guidelines" because she engaged in "impermissible double-counting" of S.B.'s death; unreasonably believed defendant would reoffend; improperly based sentencing enhancement on "allegations of domestic violence" instead of convictions; and failed to find defendant's behavior partly excused under mitigating factor four, N.J.S.A. 2C:44-1(b)(4), despite the expert testimony about his mental illness.

We review sentences "in accordance with a deferential standard," State v. Fuentes, 217 N.J. 57, 70 (2014), and are mindful that we "should not 'substitute [our] judgment for those of our sentencing courts,'" State v. Cuff, 239 N.J. 321, 347 (2019) (quoting State v. Case, 220 N.J. 49, 65 (2014)). Thus, we will

> affirm the sentence unless (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."
>
> [Fuentes, 217 N.J. at 70 (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).]

Under New Jersey's penal code, "a sentencing court first must determine, pursuant to N.J.S.A. 2C:44-1(a) and (b), whether aggravating and mitigating

factors apply. After balancing the factors, the trial court may impose a term within the permissible range for the offense." State v. Bieniek, 200 N.J. 601, 608 (2010). We do not "'substitute [our] assessment of aggravating and mitigating factors' for the trial court's judgment." State v. Miller, 205 N.J. 109, 127 (2011) (quoting Bieniek, 200 N.J. at 608). Still, "[i]n their application of the N.J.S.A. 2C:44-1 factors, sentencing courts are cautioned to avoid 'double counting' circumstances that the Legislature has already incorporated as an element of the offense." State v. Lawless, 214 N.J. 594, 608 (2013).

Ultimately,

> [w]hether a sentence should gravitate toward the upper or lower end of the range depends on a balancing of the relevant factors. Fuentes, 217 N.J. at 72. "[W]hen the mitigating factors preponderate, sentences will tend toward the lower end of the range, and when the aggravating factors preponderate, sentences will tend toward the higher end of the range." State v. Natale, 184 N.J. 458, 488 (2005).
>
> [Case, 220 N.J. at 64-65 (second alteration in original) (citations reformatted).]

Here, the judge imposed an aggregate sentence of life in prison for murder, subject to NERA, and a consecutive five-year term for stalking in violation of a

protective order and witness tampering.[7]  The judge found aggravating factors

one, three, six, nine, and fifteen based on the brutal and heinous nature of the

murder, the high risk of re-offense, the extent of defendant's prior criminal

history, the need for deterrence, and the numerous acts of domestic violence that

preceded the murder.  See N.J.S.A. 2C:44-1(a)(1), (3), (6), (9), (15).  The judge

found mitigating factor eleven based on the excessive hardship imprisonment

posed to defendant's minor child and the difficulty posed by defendant's physical

condition.  See N.J.S.A. 2C:44-1(b)(11).  The judge was "clearly convinced that

the [a]ggravating [f]actors substantially and vastly . . . outweigh[ed] the

[m]itigating [f]actor[]," both on a qualitative and quantitative basis.  We analyze

each factor that defendant challenges in turn.

Starting with aggravating factor one, "[t]he nature and circumstances of

the offense, and the role of the actor in committing the offense, including

whether or not it was committed in an especially heinous, cruel, or depraved

---

[7]  Specifically, defendant was sentenced to life in prison, subject to NERA, on count one; a five-year term on count four to run concurrent with count one; a five-year term each on counts six and seven, to run concurrent with each other but consecutive to counts one and four; and an eighteen-month term on count eight to run concurrent with counts one and four.  The remaining counts merged into count one.  Defendant does not expressly challenge the imposition of consecutive sentences.  See State v. Yarbough, 100 N.J. 627, 643-44 (1985) (requiring a sentencing court to perform an assessment of specific criteria when determining whether consecutive sentences are warranted).

manner," N.J.S.A. 2C:44-1(a)(1), the judge found that the murder was characterized by "extraordinary brutality." She pointed out that defendant stabbed S.B. approximately thirty times and noted that the video footage of the murder "was difficult to watch."

The judge explained:

> [I]f there was any case [in] which the [c]ourt can find [a]ggravating [f]actor [o]ne, it is this case. Based on the heinous nature of the present offense, the [c]ourt is satisfied that consideration of [a]ggravating [f]actor [o]ne would not constitute double counting because of the pain, harm, and suffering that . . . defendant inflicted upon [S.B.] which went well beyond his intention to cause her death.

We discern no abuse of discretion in the judge's finding which is amply supported by the record. Our Supreme Court has held that "cruel" or excessive conduct showing an intent to cause pain and suffering in addition to an intent to cause death may justify applying aggravating factor one. Fuentes, 217 N.J. at 75 (quoting State v. O'Donnell, 117 N.J. 210, 217 (1989)); see also State v. Bowens, 108 N.J. 622, 639-40 (1987), abrogated in part on other grounds by State v. Tate, 216 N.J. 300 (2013) (affirming application of the factor where a stabbing was considered "brutal"). "A sentencing court may consider 'aggravating facts showing that [a] defendant's behavior extended to the extreme reaches of the prohibited behavior.'" Fuentes, 217 N.J. at 75 (alteration in

57

original) (quoting State v. Henry, 418 N.J. Super. 481, 493 (Law Div. 2010)). A defendant's premeditation and planning may also justify application of this factor. State v. McGuire, 419 N.J. Super. 88, 159-60 (App. Div. 2011).

To support aggravating factor three, "[t]he risk that the defendant will commit another offense," N.J.S.A. 2C:44-1(a)(3), the judge considered defendant's prior New York misdemeanor contempt conviction for violation of a restraining order, the overall "seriousness of [his] criminal record," including "six known arrests," and Bardey's and Simring's testimony and respective reports. The experts detailed defendant's domestic violence history and concluded that his chronic mental disease predisposed him to anger, vindictiveness, and conflict with women. In that regard, the judge cited defendant's own statement "that he [was] unable to control himself." The judge also noted defendant's perceived lack of remorse, evidenced by him "speaking throughout [the hearing] and at times smiling during the times [S.B.'s family and friends] . . . made [impact] statements to the [c]ourt." She concluded defendant was "incapable of leading a law[-]abiding life" or "being in the presence of women without harming them."

Again, we discern no abuse of discretion in the judge's finding, which is supported by credible evidence in the record. Courts may consider a defendant's

criminal history and other pertinent factors, like "a defendant's lack of remorse," to support finding aggravating factor three. State v. Rivera, 249 N.J. 285, 300 (2021). Further, prior arrests and dismissed charges may be considered as long as the court states why they are "relevant to the character of the sentence being imposed." State v. Tanksley, 245 N.J. Super. 390, 396-97 (App. Div. 1991); see also State v. Cassady, 198 N.J. 165, 182-84 (2009) (affirming sentencing court's consideration of defendant's prior conviction and "numerous" outstanding matters). But see State v. K.S., 220 N.J. 190, 199-200 (2015) (holding that where charges were dismissed, "[t]he prosecutor and program director may not infer guilt from the sole fact that a defendant was charged" in considering a Pretrial Intervention Program application). We also reject defendant's argument that his age precluded application of aggravating factor three. See State v. Torres, 246 N.J. 246, 273 (2021) ("An older defendant who commits a serious crime . . . cannot rely on age to avoid an otherwise appropriate sentence.").

Turning to the judge's rejection of mitigating factor four, that "[t]here were substantial grounds tending to excuse or justify the defendant's conduct, though failing to establish a defense," N.J.S.A. 2C:44-1(b)(4), the judge stated:

> I strongly reject [m]itigating [f]actor [f]our. The [j]ury wholly rejected the defense of diminished capacity. The [j]ury heard the testimony of . . . [Bardey], and heard the testimony of . . . [Simring], and rejected the

> defense of diminished capacity. There is no justification. There is no excuse that justifies this brutal murder.

The record supports the judge's reasons for rejecting mitigating factor four. Sentencing courts must consider mitigating factors supported by the record. State v. Dalziel, 182 N.J. 494, 504-05 (2005). Although an insanity defense rejected by a jury to excuse criminal culpability may constitute a mitigating factor for sentencing purposes, see Nataluk, 316 N.J. Super. at 349, nothing in the law obligates a sentencing court to find the factor.

Finally, we acknowledge that one prior indictable conviction may be insufficient to support a finding of aggravating factor six, "[t]he extent of the defendant's prior criminal record and the seriousness of the offenses of which the defendant has been convicted," N.J.S.A. 2C:44-1(a)(6). Nevertheless, the judge acknowledged that defendant had "no felony record" and only placed "a small amount of weight" on this factor. We conclude that despite the error, the sentence is sufficiently supported by the other factors found, and we are satisfied that the excision of aggravating factor six would not alter the term, obviating any need for a remand. We therefore discern no basis to disturb the sentence imposed.

In sum, we affirm the convictions and sentence. To the extent we have not addressed a particular argument, it is without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division

A-2242-19